## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MORGAN STANLEY SMITH BARNEY, LLC,    : | |
|        Plaintiff,               : | Case No. 5:19-CV-1933 |
|    v.                          : | |
| JULIE KNIGHT,                 : | |
|        Defendant.        : | |

### DECLARATION OF DEFENDANT JULIE KNIGHT

I, Julie Knight, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      My name is Julie Knight. I am over the age of twenty-one, and I submit this Declaration in opposition to the Motion for Temporary Restraining Order and Preliminary Injunction filed by Morgan Stanley Smith Barney LLC ("Morgan Stanley"). I have personal knowledge of the facts stated in this Declaration, and the facts stated herein are true and correct to the best of my knowledge, information and belief.

2.      I have been a financial advisor for approximately nine years, but the financial industry was not my first career and far from my first job. Before I even went to college, I worked for four years in a customer relations capacity, and subsequently worked in a sales management and field trainer position during my final year of college. After graduation in 2001, I relocated to Stuttgart, Germany, where I held multiple consulting positions coaching financial and business English and providing other communications project consulting services. I obtained my MBA from the University of Melbourne – Melbourne Business School in Australia, a top ranked global MBA. I returned to the United States in 2007 and went back into sales and

customer relations positions for logistics and engineering firms. In 2010, I made a career change and decided to apply my business and client relationship experience to launching a career in financial services. I took a position with Morgan Stanley in its Allentown, Pennsylvania office, where I remained until I resigned on Friday, April 26, 2019. Following my resignation from Morgan Stanley, I accepted employment with Janney Montgomery Scott LLC ("Janney"), a Philadelphia-based broker-dealer.

3.      In the course and scope of my profession, I assist individuals and families with their securities investments, life insurance needs, and financial planning, including retirement planning. To this end, aside from obtaining certain securities licenses, I also studied for and obtained the status of a Certified Financial Planner ("CFP"), a designation granted and administered by the Certified Financial Planner Board of Standards, Inc. I also obtained additional certifications to be designated as Certified in Long Term Care ("CLTC"), as well as becoming a Certified Divorce Financial Analyst ("CDFA"). Each of these designations involves, as their names imply, intensive study to be in a position to guide clients and their families through these particularly challenging changes in their lives. This typically involves coordinating closely not only with my clients' family members, but also their lawyers, accountants and others involved in the process.

4.      In addition to the offering clients substantive financinal planning knowledge, as a CFP, I also owe a fiduciary duty to those clients to whom I provide financial planning services. This is a heightened duty of care compared to non-CFP registered representative financial advisors.

5.      For the past nearly nine years, I worked hard to develop my client base through my own personal efforts, community and family connections, civic involvement, and substantial

professional networking. Many of my clients are my family members and personal friends I have known for years, or connections I made through my friends and family. My clients also include individuals I met by participating in local community activities for years prior to my employment with Morgan Stanley, as well as business organizations and municipal officials, many of whom I had built relationships with in my prior career before joining Morgan Stanley.

6.     By way of example, many of my clients include, or were developed from my long-time participation in the Greater Lehigh Valley Chamber of Commerce, Toastmasters, United Way, YWCA of Allentown, Girl Scouts of Eastern PA, Estate Planning Council of the Lehigh Valley, the Council of Supply Chain Management Professionals ("CSCMP"), Penn State Launchbox Board, the Swain School, and Lehigh Valley Aging in Place.

7.     At least 80%, if not more, of the clients I serviced at Morgan Stanley were originated and developed by me through personal relationships, including with personal friends, family members, and others I have met socially or have developed through my own personal efforts to market and grow my business.

8.     When I joined Morgan Stanley in 2010, it had, for some time, been a member of the Protocol for Broker Recruiting (the "Protocol"). In fact, I understand that Morgan Stanley Smith Barney's other constituent firm, Smith Barney, was a founding member of that Protocol back in 2004. As such, throughout my employment with Morgan Stanley, I understood that if I were to leave at any time and join another one of what I understand is now more than 1,800 Protocol member firms, I would be permitted to take a list of my clients and freely solicit them to follow me to my new firm. That was my understanding up until late 2017 when Morgan Stanley unilaterally decided to leave the Protocol and begin enforcing non-solicitation covenants against

its departing financial advisors. This abrupt about-face was one of multiple changes and problems at Morgan Stanley that led to my decision to leave.

9.     My decision to leave Morgan Stanley was primarily based on my concerns about the shifting culture and environment at the firm, and was cemented when my Morgan Stanley business partner, Michael Malz, openly (i) questioned my choice to have children, and (ii) unilaterally reduced my business share on future shared institutional client accounts from 50/50 to 100/0 directly following my return from maternity leave in 2014. It was presented as an ultimatum. Either take the reduction in future clients, break up the partnership or relinquish all clients to him and become his assistant on a fixed salary.

10.     By way of background, in the course of my employment with Morgan Stanley, I entered into a teaming arrangement with Mr. Malz, a longer-tenured male Morgan Stanley Financial Advisor who also works out of Morgan Stanley's Allentown office. Under this business arrangement, we initially agreed to split all new co-developed clients in a combined book of business on an equal "50/50" basis. However, after my maternity leave, Morgan Stanley allowed Malz to unilaterally alter this arrangement to a 100/0 split in his favor.

11.     When I returned from maternity leave, and despite being one of the top producers in my region, my business split with Malz remained at 100/0, while his splits with other male advisors continued to be 50/50. I attempted on multiple occasions to discuss and renegotiate this disparity with Malz, but he refused to engage with me about the topic, including by failing to show up at scheduled meetings.

12.     Of course, I was unhappy with the 100/0 split because it was not at all based on my performance, my contributions to the effort, or any other objective metric. Rather, it was clear to me, based on, among other things, his related comments, that my share was reduced only

4

because Malz disagreed with my decision to have children. Essentially, he felt that, as a woman, raising a family would interfere with my business efforts. However, he did not express similar concerns for his male business partners.

13.     At a firm meeting in New York City in December 2018, I complained to a Morgan Stanley Complex Manager about my concerns. The Complex Manager responded that he was aware of diversity issues at the firm, but commented that there were diversity issues in other Morgan Stanley complexes too, not just in my geographic area. To me, this was a devastatingly nonchalant non-response. It simply is not appropriate or acceptable for the regional leadership of the largest firm on Wall Street to accept or excuse discriminatory conduct by senior male employees, simply because such conduct occurs elsewhere within the firm.

14.     I wanted no part of a firm that would strip me of my book of business by diverting a substantial portion of my revenue stream to a preferred male advisor, simply because I decided to have children. I also wanted no part of a firm that ignored my concerns about discriminatory behavior, as if that conduct was a normal and accepted part of its culture. Accordingly, I began reviewing my options for alternate employment, eventually deciding to affiliate with Janney. The move to Janney allows me to return to a Protocol member firm, and to service my clients in a more family-friendly, client-centered environment.

15.     When I left Morgan Stanley, I did not take any printed or electronic client information with me. The only information about clients I have access to now at Janney is whatever I have been able to locate relying solely on my memory and publicly available sources of information. For example, I searched for contact information through basic, publicly accessible internet resources, such as Google and White Pages.

16.    In her Affidavit, my former Portfolio Associate, Adrianne Fox incorrectly states that I maintained active paper files for my clients in my former Morgan Stanley office. I was surprised to see this comment because Ms. Fox is well-aware that I had a regular practice in which, after I onboarded a new client, I would give Adrianne my paper notes and other documents that I had collected on the client prospect to scan into Morgan Stanley's Client Relationship Management ("CRM") system after they became an actual client, and I did not retain paper copies. Indeed, I routinely operated in a largely paperless fashion throughout my tenure with Morgan Stanley.

17.    Given my practice of digitizing all my client information, Morgan Stanley has full and complete access to the client documentation I created during the course of my employment, and again, I did not retain this information following my resignation. To be clear, I also did not destroy client information in preparation for my resignation, or to otherwise put Morgan Stanley at some competitive disadvantage, as it now alleges. Indeed, the truth is essentially the opposite. I routinely took steps to make sure my notes of client conversations were entered into Morgan Stanley's CRM system in the space designated in the system for doing so. All that information of course is available to Morgan Stanley right now. Mr. Malz knows full well that I was a dedicated user of the electronic recordkeeping systems at Morgan Stanley. In fact, we had a business process coach approved by Morgan Stanley that worked with us on business strategy and efficiency, John Burke of Elements Consulting LLC, who observed and commented on the fact that I used the Morgan Stanley CRM system consistently and effectively. Likewise, Mr. Malz had complimented me on how process-oriented I was, and how effectively I used the CRM system. Both our coach, Mr. Burke, and I had been urging Mr. Malz to do the same for quite some time. I expect this fact would be documented in our coaches' notes and records.

6

18.     The only paper files I routinely maintained in my office were for prospective clients who had not yet onboarded with Morgan Stanley, as well as marketing materials and fund information I received from various wholesalers who visited the office, birthday cards I designed and paid for, and my paper day planners. With respect to prospective client files, I would keep these materials on hand until the prospective client onboarded and became a client, at which point I would provide the materials to Ms. Fox for scanning into Morgan Stanley's CRM system and then destruction. However, if the prospective client did not materialize into an actual client, the files would remain in the drawers in my office until such time as I would include those paper documents in a routine file shredding, which I periodically undertook to protect privacy, as well as to comport with Morgan Stanley's clean desk policy and its preference for paperless file maintenance. In this respect, the only documents I shredded any time in the months prior to my resignation concerned unmaterialized prospects, information that was already scanned into Morgan Stanley's CRM system, unused birthday cards I had sitting around, and wholesaler information, which did not relate to my clients in any event. I also left my paper day planners in my Morgan Stanley desk.

19.     Also during that same time period, we had a new assistant, Becca Braun, join our team at Morgan Stanley.  One of the projects I gave her was organizing and/or disposing of a large amount of company brochures and marketing documents I had in my office. Many of these she found to be outdated and disposed of.  A substantial number were not outdated, and Ms. Braun organized them and stored them in a large box.  Still other up-to-date brochures and materials were used at a vendor table at an event I attended.  Taken together, this also would be a large amount of paper materials removed from my office in the months prior to my resignation.

20.     After joining Janney on April 26, 2019, I announced my new affiliation to those of my clients whose information I had been able to obtain from public sources and relying solely on my memory. I have not solicited any of my clients to follow me from Morgan Stanley to Janney. I simply advised those of my clients whom I was able to contact that I had left Morgan Stanley and joined Janney. I also provided them with my new contact information so that they could contact me in the future if they choose to do so. And I advised clients that they would receive a Financial Industry Regulatory Authority ("FINRA") educational communication that I understand I was required to mention and provide pursuant to FINRA Rule 2273, as both Morgan Stanley and Janney are FINRA-regulated broker-dealers. If clients had questions, I answered those questions. Otherwise, I ended the conversation at that point.

21.     In this regard, Mr. Malz's assertion in his Affidavit that I solicited three clients is false. After we received Morgan Stanley's court papers, my attorneys asked Morgan Stanley's attorneys for the identities of the clients Mr. Malz claims I solicited. So far, Morgan Stanley has provided us with two of the three names. The first of these, the couple that Mr. Malz mentions are farmers, is a couple that I worked with at Morgan Stanley. The wife answered when I called. I told her that I had left Morgan Stanley and joined Janney. She is hard of hearing and asked me to repeat myself a few times, but I answered a number of questions they asked me about my new contact details, the location of my new office, and how to get to it. They also asked that I send them some information about Janney and what would be involved in moving their accounts. I told them I would do that, and ended the call.

22.     The second client whose identity Morgan Stanley provided to my counsel is a retired couple. The husband has dementia so when he answered the phone I asked to speak with his wife. I told her I had left Morgan Stanley and joined Janney, and then was not surprised

8

when she advised me that they had been through "5 or 6" advisors over the years with Morgan Stanley, and they all left, but that she and her husband always stay with the firm. She told me they would do the same now, and just work with whoever would be the next person assigned to their account at Morgan Stanley. I told her I respected that, and we ended our call. I never solicited this client to move their account. Quite the opposite, when she somewhat predictably advised me she was staying, I was polite and respectful about that, and ended the call.

23.    We do not yet have the name of the third client that Mr. Malz claims I solicited, and he provides absolutely no identifying details about that one in his Affidavit, so it is impossible for me to respond with any particulars about that allegation. But I can say that what I did in my calls was simply to announce my new affiliation with Janney, and then answer questions if clients asked them, or provide information if clients requested it, and if not, then I ended the call.

24.    I also have heard from a great number of my clients who reached out to me in response to multiple confusing communications they received from Morgan Stanley. Evidently, shortly after my resignation, Morgan Stanley sent a written communication to my clients mistakenly suggesting Mr. Malz had left. Thereafter, Morgan Stanley sent another communication attempting to clarify this issue. All of this sowed confusion among my clients, and led to a number of them calling me to find out what was happening.

25.    Some of my clients have told me that they wish to continue doing business with me. For those clients who told me they wanted to transfer their accounts, I have provided them with the information and documentation they need to trigger the account transfer process. I have not provided account transfer information or documentation to any client who did not request it.

9

26.     I feel it is important to let clients know where I am and how they can reach me for both personal and professional reasons. As a CFP, I owe many of these clients a fiduciary duty. In fact, the CFP Board has promulgated Rules of Conduct that govern all CFPs.  Rule of Conduct 2.2 specifically states that a CFP (referred to by the Board as a "certificant") must keep his or her clients apprised of any changes in the CFP's contact information:

> A certificant shall disclose to a prospective client or client the following information . . . Contact information for the certificant and, if applicable, the certificant's employer. . . .   The certificant shall timely disclose to the client any material changes to the above information.

CFP Board, Rules of Conduct, Rule 2.2 (available at https://www.cfp.net/for-cfp-professionals/professional-standards-enforcement/current-standards-of-professional-conduct/standards-of-professional-conduct/rules-of-conduct#2).  Further, leaving Morgan Stanley without letting my clients know that I am affiliated with a new financial services firm and without letting them know how they can reach me if they choose to do so would seem irresponsible and a violation of my clients' trust in me. Many of my clients are close personal friends and family members. If I completely disappeared from those clients without informing them of my change of employment, I would almost certainly hinder those personal relationships. The clients noted above, that Mr. Malz falsely claims I solicited, are the exact sort of clients I worry about leaving in the lurch without even hearing from me that I have moved, given their age and difficulty with complicated communications. This is particularly true in light of the confusing and inaccurate communications Morgan Stanley has sent these same clients.

27.     The injunction Morgan Stanley has requested would be devastating to my business and my clients, and it would cripple my ability to support my family, including my two young children.  I fear that clients would perceive a Court order enjoining me as a ruling that I have engaged in wrongdoing. For clients who might otherwise wish to

continue our relationship, they might assume that the Court's order means that it would be unlawful for me to service their accounts at Janney. I understand that while I would be barred from seeking to speak to my clients, some of whom have known and worked with me for many years, Morgan Stanley would have unfettered access to my clients for weeks, or longer, and during that time would be permitted to try to persuade clients that they should no longer work with me. I feel that this would deprive my clients of the opportunity to make an informed decision about whether to keep their accounts at Morgan Stanley, or to continue having their accounts handled by me at Janney.

28.    Finally, I do not understand how Morgan Stanley can claim that it faces "irreparable harm" from my departure or the loss of my clients. Morgan Stanley is the largest firm on Wall Street, employing more than 15,000 financial advisors and holding more than $2.3 trillion in client assets under management in the Wealth Management division alone. That division generated $17.2 billion in net revenue for Morgan Stanley in 2018 (https://www.morganstanley.com/about-us-ir/shareholder/4q2018.pdf).    In addition, as I understand it, as a Protocol firm, Morgan Stanley for years and years permitted advisors to take detailed client lists (which I have not done), and to aggressively solicit clients to leave Morgan Stanley (which I also have not done). Yet, it does not appear that Morgan Stanley has been harmed, "irreparably" or otherwise, by allowing departing advisors to do all of that for more than a decade. In fact, it appears Morgan Stanley has thrived. Morgan Stanley has repeatedly touted its success in the marketplace and boasted of its status as the industry leader in private client wealth management. I do not believe that an advisor departure such as mine really threatens Morgan Stanley with irreparable harm.    Morgan Stanley's own track record of

11

prospering while allowing advisors to leave and take their clients with them suggests exactly the opposite.

I declare under penalty of perjury that the foregoing is true and correct.

Julie Knight

Date:   May 5, 2019

FPDOCS 35321135.6