EXHIBIT "A"

FINANCIAL INDUSTRY REGULATORY AUTHORITY

| | | |
|---|---|---|
| **In the Matter of the Arbitration Between** | ) | |
| | ) | |
| **CHARLES SCHWAB & CO., INC.** | ) | |
| | ) | **FINRA NO. 11-04088** |
| Claimant, | ) | |
| | ) | |
| -and- | ) | |
| | ) | |
| **TODD THRASHER & MORGAN** | ) | |
| **STANLEY SMITH BARNEY LLC,** | ) | |
| | ) | |
| Respondents. | ) | |

## RESPONDENT MORGAN STANLEY SMITH BARNEY LLC'S PREHEARING BRIEF

### I. Introduction

Charles Schwab & Co., Inc. ("Schwab") will be unable to show as a matter of law that Morgan Stanley committed the torts of unfair competition or tortious interference with Schwab's contractual or business relationships. After more than a year and a half of discovery, Schwab had not been able to show any evidence that Morgan Stanley acted unfairly or tortiously interfered in any of Schwab's business relationships.

Schwab's case hinges on proving two things: (1) that Respondents improperly took and used confidential or trade secret information, and (2) that Thrasher solicited customers to transfer to Morgan Stanley.

The evidence will show that Thrasher only used a contact list he created with names, addresses and phone numbers to contact customers to announce his arrival at Morgan Stanley. Claimant will not be able to show solicitation, let alone solicitation in every instance for the Panel to award damages from the transfer of accounts from Schwab to Morgan Stanley. Indeed, Morgan Stanley's and Thrasher's expert witness conducted a survey of customers serviced by Thrasher at Morgan Stanley who transferred from Schwab and nearly all of the customers

1

responded they would have contacted Thrasher even if they had only received a written announcement of Thrasher's move to Morgan Stanley. This is not surprising given that only approximately 31 households transferred to Morgan Stanley out of approximately 200. The others all stayed at Schwab.

Upon resigning from Schwab, Thrasher simply did what financial advisors do when they first join a firm – he contacted customers to announce that he had left Schwab and was now employed with Morgan Stanley. Announcements, whether verbal or by letter, are not solicitations. Further, the contact list that Thrasher created containing the names, addresses and telephone numbers of the customers that Thrasher serviced while at Schwab is not entitled to trade secret protection.

The panel conducted a Rule 13804 hearing in December 2011. In ruling on a request for an injunction, the panel enjoined Thrasher from further contact with or solicitation of Schwab customers. The Order contained no findings of fact or conclusions of law.

## II. <u>Statement of Facts</u>

Thrasher has worked in the financial services industry for over twenty years. He joined Schwab in 1992 and became a private client consultant, now known as a financial consultant, in 2002. Thrasher helped launch the Schwab Private Client services program in Missouri in 2002 as a "Private Client Consultant." Thrasher worked for Schwab until October 14, 2011, when he resigned and became employed by Morgan Stanley.

The proof at the Rule 13804 hearing showed Thrasher's decision to leave Schwab was as a result of changes in the way Schwab treated him, including downgrading his title, changing and decreasing his compensation, giving him the responsibilities of "acting branch manager" without

any additional compensation, and altering his job duties.  Thrasher was not happy at Schwab and believed his position was in jeopardy.  For these reasons, Ms. Thrasher decided to leave Schwab.

After a period of due diligence, Thrasher resigned from Schwab on October 14, 2011 and joined Morgan Stanley immediately thereafter.  Morgan Stanley offered Thrasher a typical compensation package.  The proof at the Rule 13804 hearing showed that Thrasher did not solicit any customers prior to leaving Schwab.  (Transcript of December 2, 2011 13804 Hearing ("Hearing"), 217:25-218:10) (relevant pages attached as Exhibit A).  He did not compete with Schwab or neglect any duty owed to Schwab prior to leaving the firm's employ.  Thrasher testified that he did not inform any customers or colleagues about his decision to leave until he announced his resignation to Schwab.  (*Id*.).  It is undisputed Thrasher did not take any customer files or other Schwab documents with him when he resigned.

The only document that Thrasher had after he resigned was a contact list that he had created over several years that contained a running list of customers' names, addresses and telephone numbers (*Id*. at 70:17-71:10; 76:5-16).  After his resignation, he also created a list of names from memory of customers that he had serviced while at Schwab.  (*Id*. at 114:7-12).  The proof will show that it is common practice in the financial services industry for financial advisors to have such a list when they leave a firm.

Additionally, the evidence from the Rule 13804 hearing showed that Thrasher inadvertently provided to Morgan Stanley prior to his resignation one document that contained customer account information, but the evidence proved the document was not used by Thrasher or Morgan Stanley.  Indeed, Thrasher had forgotten that he had given Morgan Stanley the document until he was presented with it at his deposition.  (Transcript of Deposition of Todd Thrasher ("Thrasher Dep."), 59:21-25) (relevant pages attached as Exhibit B).  The evidence at

the final hearing will also show that Morgan Stanley employees did not realize the contents of the document until they began gathering documents for discovery in this matter. Morgan Stanley's counsel returned the document immediately in the beginning of the case before discovery requests were even served in the case. Thus, because the document was returned over two years ago, Schwab cannot be damaged by Morgan Stanley's temporary and unknowing possession of the document.

After leaving, Thrasher did not send any solicitation mailings or newsletters and did not place any advertisements. (Hearing at 131:3:11). As Thrasher testified at the 13804 hearing, after resigning, Thrasher called some of the customers that he serviced at Schwab to inform them of his move. (*Id.* at 110:15-111:10). He did not solicit those customers' business, but simply informed them of his move and gave his contact information. (*Id.* at 122:19-125:25). If a customer told him that he/she didn't intend to transfer to Morgan Stanley, Thrasher terminated the call and would not follow up. (Thrasher Dep. at 245:9-246:11). Thrasher's announcement to his customers was consistent with his duties to his customers, and neither he nor Morgan Stanley used any Schwab confidential or trade secret information.

### III. <u>Argument</u>

Morgan Stanley requests that the Panel dismiss all of Schwab's claims against Morgan Stanley. Morgan Stanley did not misappropriate or misuse any of Schwab's trade secrets; Thrasher did not solicit customers to transfer; Morgan Stanley did not interfere with Schwab's contractual or business relationships; and Morgan Stanley did not engage in unfair competition against Schwab.

1.   **Respondents did not misappropriate or misuse confidential or trade secret information.**

Schwab has the burden to show this Panel clear and convincing evidence that Respondents have misappropriated confidential information or trade secrets, but cannot do so. Morgan Stanley does not have in its possession any Schwab trade secret information. Thrasher did not misappropriate any trade secrets from Schwab. Thrasher only had a contact list he created with customers' names, addresses and telephone numbers. He had no other customer information. The names, addresses and telephone numbers of customers serviced by Thrasher are not confidential, protectable trade secret information.

The Missouri Uniform Trade Secrets Act defines a trade secret as information that is "not being generally known to, and not being readily ascertainable by proper means." Mo. Ann. Stat. § 417.453(4)(a). The names, addresses and telephone numbers of customers that Thrasher serviced while at Schwab are generally known to Thrasher and are readily ascertainable from public sources and, thus, are not entitled to trade secret protection. *See Brown v. Rollet Bros. Trucking Co., Inc.*, 291 S.W.3d 766, 777 (Mo. Ct. App. 2009) ("'[t]o be protected, a customer list must be more than a listing of firms or individuals which could be compiled from directories or other generally available sources.'") (quoting *Kessler-Heasley Artificial Limb Co., Inc. v. Kenney*, 90 S.W.3d 181, 185 (Mo. Ct. App. 2002).[1] The information on Thrasher's contact list could be compiled from generally available sources and, thus, is not entitled to trade secret protection.

Courts in other jurisdictions have considered this very issue and determined that "within the securities industry employers do not have a protectable interest in preserving and maintaining for themselves customer records or the right to prevent former employees from dealing with

---

[1] All cited cases are attached alphabetically as Exhibit C.

customers." *Dean Witter Reynolds, Inc. v. Imperatore*, C-32-97E, Transcript of Hearing on Motion, *9 (N.J. Super. Ct. Feb. 14, 1997), attached as Exhibit D; *see also UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436 (W.D.N.C. 2002) (customer contact information in the securities industry found not to be a trade secret); *Novacare Orthotics & Prosthetics v. Speelman,* 528 S.E.2d 918, 922 (N.C. Ct. App. 2000) (customer list not trade secret because information used to contact customers was "easily accessible to defendant through a local phone book").

It is accepted industry practice for brokers to take with them copies of customer identifying information so that those customers who choose to follow the broker can be serviced at the new firm. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Callahan*, 265 F. Supp. 2d 440 (D. Vt. 2003) (denying injunctive relief, in part, because standard industry practice is for brokers to solicit former customers); *Morgan Stanley Dean Witter, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1378 (N.D. Ga. 2001) ("A review of the standard and customary practice of the securities industry, as well as of Morgan Stanley's own corporate practice, demonstrates that the customers and customer information at issue here are not proprietary to Morgan Stanley, nor are they sufficiently "secret" for trade secret protection."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E.F. Hutton & Co., Inc.*, 403 F. Supp. 336, 341 (E.D. Mich. 1975) (stating that it is established practice for brokers to retain customer lists when they depart and the removal of customer lists and solicitation of customers is a standard industry practice).

Morgan Stanley expects that Schwab will attempt to argue that misappropriation and misuse of trade secrets is established by introducing evidence that Thrasher provided a document to Morgan Stanley shortly before his resignation from Schwab. During discussions with Morgan Stanley regarding employment opportunities, Thrasher provided Morgan Stanley with a

document that contained information about his practices at Schwab and customer account information. The proof will show that Morgan Stanley did not ask Thrasher for this information, but instead sought general information as to his gross revenue production and types of accounts. Thrasher had forgotten about the document and Morgan Stanley discovered the contents of the document shortly after Schwab filed its arbitration claim. The proof will show that neither Thrasher nor Morgan Stanley used the information contained in the document. Upon discovering the document, Morgan Stanley immediately returned it to Schwab even before the Rule 13804 hearing and neither Morgan Stanley nor Thrasher has copies of the document.

Because the document was returned and was unused, the issue of the customer account information contained in the document is moot and cannot form the basis for any misappropriation claim.

### 2. Morgan Stanley has not interfered with Schwab's contractual and business relationships.

Under Missouri law, a claim for tortious interference with a contract or business expectancy requires proof of each of the following: "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and, (5) damages resulting from defendant's conduct." *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372-73 (Mo. 1990). For Schwab to prevail on its claim for tortious interference, it must establish that some improper action by Morgan Stanley caused Thrasher to breach his agreement with Schwab. *See Cmty. Title Co.*, 796 S.W.2d at 372.

7

a.    <u>Thrasher did not breach his agreement with Schwab.</u>

Schwab's interference claim fails out of the gate because Schwab will be unable to establish a breach of contract.

i.    <u>Only the most recent version of Schwab's employment agreement controls and that agreement permits Thrasher to announce to customers a change in employment to another broker-dealer.</u>

During his employment with Schwab, Thrasher signed multiple agreements that contained different types of restrictions. The restrictions in Schwab's agreement have evolved over time. The 2002 Agreement contained a twenty-four month non-solicitation restriction and a very broad non-compete provision that required Thrasher not to "sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or prospective customers of Schwab that I serviced (directly or indirectly)...or whose identity I learned, during my employment with Schwab."

The 2004 and 2006 agreements have an eighteen month restriction against solicitation and a more limited non-compete that Thrasher not "sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or Prospective Customer of Schwab that I solicited or attempted to solicit in breach of my obligations hereunder." The agreements also contain a restriction against "initiat[ing] any contact for any purpose with any of the Specified Accounts (including notifying them of my new or subsequent place(s) of employment)" for twelve months. The 2007 agreement contains similar restrictions, but does not have a non-compete restriction.

The 2008 and 2010 Agreements are the least restrictive, dropping the earlier "no contact" provisions, and only contain an eighteen month non-solicitation restriction against "directly or indirectly solicit[ing] or induc[ing]...any existing or prospective Schwab clients [Thrasher]

serviced or about whom [Thrasher] gained Confidential Information in an attempt to divert, transfer or otherwise take away business or prospective business from Schwab." The 2008 and 2010 Agreements contain no restriction upon Thrasher's rights to notify the customers he serviced at Schwab of his change of employment or provide them with his personal contact information. For the reasons set forth below, only the restrictions and obligations of the 2010 Agreement are binding on Thrasher, which do not prevent Thrasher from contacting customers.

ii.   <u>Schwab's restrictions are overly restrictive to protect any legitimate business interest.</u>

Many of the restrictions contained in the earlier dated agreements are unenforceable under Missouri law because they are overly broad and unreasonable, particularly the restriction against contacting clients for any purpose and the restriction from selling products to customers, regardless of whether Thrasher serviced them when he was employed by Schwab.

In Missouri, agreements that restrain trade, such as covenants not to compete and non-solicitations, are disfavored. As such, triers of fact are to construe such restrictions narrowly and in favor of the employee, and, above all, be reasonable. *Orchard Container Corp. v. Orchard*, 601 S.W.2d 299, 303 (Mo. App. 1980) ("An employer may only seek to protect certain narrowly defined and well-recognized interests, namely its trade secrets and its stock in customers"); *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 74 (Mo. 1985). For Schwab to enforce the non-solicitation provision in the Agreement, Schwab has the burden of demonstrating "'both the necessity to protect the claimant's legitimate interest and that the agreement is reasonable as to time and space.'" *Payroll Advance, Inc. v. Yates*, 270 S.W.3d 428, 434 (Mo. Ct. App. 2008) (quoting *Healthcare Services of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 609-10 (Mo. 2006)). Schwab will not be able to establish a protectable interest for which the non-contact, non-solicitation and non-compete restrictions are necessary.

9

Schwab is unable to establish a protectable interest for which the earlier dated restrictive covenants are necessary.   Schwab may have an interest in protecting itself against unfair competition or solicitation, but "[a]n employer cannot extract a restrictive covenant from an employee merely to protect itself from competition."   *Systematic Bus. Services, Inc. v. Bratten*, 162 S.W.3d 41, 49 (Mo. Ct. App. 2005).   There is no protectable interest in preventing Thrasher from contacting customers.   Customers have a right to choose where they do business and it is Thrasher's duty to let them know he has moved so that they can make an informed decision about where to do business.   Even if Schwab has a protectable interest, Schwab will be unable to show that the restrictive covenants are reasonable.   The restrictions go well beyond protecting Schwab against unfair competition and are far more restrictive than necessary to protect any of Schwab's legitimate interests.   Schwab's overly broad restrictions serve only to punish Thrasher, something that is not permitted under Missouri law: "Protection of a former employer's legitimate business interests and not punishment of the former employee is the essence of the law." *Id*.   The fact that Schwab has changed the nature and extent of the restrictions – and even eliminated certain restrictions – over the years is further evidence that the restrictions are not reasonable.   For these reasons – in addition to those outlined above – the Panel should not enforce the noncompetition and "no contact" provisions against Thrasher.   That leaves only the 2010 Agreement, which replaced the 2008 Agreement, in place.

### iii.   Thrasher did not solicit customers.

The proof at the Rule 13804 hearing established that in the days following his resignation, Thrasher announced to several customers his departure from Schwab and employment with Morgan Stanley.   Those announcements are not solicitations as defined by the Agreement.   Thrasher testified that after he informed the customer of his new location, any

10

further conversations with customers were at the customer's initiation.   Thrasher offered information about Morgan Stanley's services and why he had left Schwab only when asked.  He did not continue to follow-up with individuals who stated that they did not want to leave Schwab.  Thrasher testified unequivocally he did not solicit, entice, request or urge any customer to transfer his or her account to Morgan Stanley.

Courts throughout the country have held that an announcement or informational contact does not constitute solicitation.  For example, in *Wells v. Merrill Lynch, Pierce, Fenner & Smith,* 919 F. Supp. 1047, 1053 (E.D.K.Y. 1994), the court held that "a mere informational contact" (defined as "any written or oral contact that provides information about the [brokers'] whereabouts and how they may be contacted") does not constitute solicitation.  *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 620 (N.D. Ill. 2000) ("It would be unlawful, as well as unreasonable, for Merrill Lynch to seek to prohibit [the broker] from giving his former customers an announcement of his intent to move to other employment and notice where he could be reached should the customers wish to contact him...an informational announcement regarding [the broker's] new employment was essential."); *Morgan Stanley DW, Inc. v. Clayson*, 2005 WL 1009651, *6 (Mass. Super. Mar. 14, 2005) ("'The customers have a paramount right to be advised of the move by their broker and, that this right includes receiving personal contact from their broker. The customers have the right to be informed that they decide whether to remain with Merrill Lynch or to transfer their account.'") (quoting *Merrill Lynch Pierce Fenner & Smith, Inc. v. Stark*, No. 02-05187 (NASD Sept. 19, 2002)).  Especially, under the law of Missouri, the relationship between a stockbroker and his customer is that of agent and principal and, accordingly, the broker has a duty to make full

11

disclosure of all facts which materially affect the subject matter of the agency. *Mercantile Trust Co., N.A. v. Harper*, 622 S.W.2d 345, 349 (Mo. App. 1981).

Even outside of the financial services industry, courts routinely find that former employees have the right to announce their new business affiliation to customers of their former employer. *See MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 521 (9th Cir. 1993) ("[T]he right to *announce* a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition, and that the common law right to compete fairly and the right to announce a new business affiliation have survived the enactment of the UTSA.") (internal citation omitted); *American Credit Indemnity Co. v. Sacks,* 213 Cal. App. 3d 622, 633 (Cal. Ct. App. 1988) (holding that "even when a trade secret customer list exists, the common law cases acknowledge a right to announce a new business affiliation as contrasted with a solicitation for patronage."); *Carriage Hill Health Care, Inc. v. Hayden,* 1997 WL 833131 at *7 (D.N.H. Apr. 30, 1997) (salesman was "entitled" to use his former employer's customer information to "announce his new affiliation" with a competitor, even if that information was a trade secret); *Aetna Bldg. Maint. Co. v. W.,* 39 Cal. 2d 198, 204 (1952) ("Merely informing customers of one's former employer of a change of employment, without more, is not solicitation.").

The proof will show that Thrasher has not solicited Schwab's customers in violation of any alleged agreement, let alone all of the customers that have transferred their accounts to Morgan Stanley. Additionally, prohibiting an informational announcement would interfere with the public's right to choose with whom they want to do business. Thrasher's customers have a right to know where Thrasher went after resigning his employment with Schwab. Any contact

that Thrasher has had with his customers has been appropriate and necessary to fulfill his duties to customers and does not violate any alleged non-solicitation provision.

iv.   Thrasher did not misappropriate confidential or trade secret information.

For the reasons discussed in Section III.1. above, neither Thrasher nor Morgan Stanley misappropriated any of Schwab's confidential or trade secret information.

b.   Morgan Stanley did not act maliciously or with improper means.

Mere profit motive and competition on the part of Morgan Stanley is not enough to show improper means.  "The mere fact that defendant's conduct may have had a negative effect on plaintiffs' business expectancies does not, *a fortiori,* establish an absence of justification." *Cmty. Title Co.,* 796 S.W.2d at 373.  Under Missouri law, a defendant is justified in interfering with another's business expectancy for the purpose of protecting his own economic interest, so long as he does not employ improper means. *Baldwin Properties, Inc. v. Sharp*, 949 S.W.2d 952, 956-57 (Mo. Ct. App. 1997); *Cmty. Title Co.,* 796 S.W.2d at 372-373.  Improper means are "those means which are independently wrongful, notwithstanding injury caused by the interference."  *Cmty. Title Co.,* 796 S.W.2d at 373.  Improper means include, "threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Baldwin Properties, Inc.*, 949 S.W.2d at 956-57.

Morgan Stanley has in no way induced Thrasher to commit any breach of contract, misappropriate trade secret information or otherwise breach any other duties to Claimant. *Tri-Cont'l Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 215 (Mo. Ct. App. 1976) ("When asserting a cause of action for intentional inducement of a breach of contract, the plaintiff must show that the defendant maliciously, that is, with knowledge of the contract and without justifiable cause, induced the breach.").   Contrary to Schwab's allegations, Morgan Stanley did not provide

13

Thrasher with substantial financial inducements or other incentives, other than what Morgan Stanley offered to all of its lateral hires, to encourage Thrasher to join Morgan Stanley. Morgan Stanley did nothing more than hire Thrasher, who had decided to leave Schwab of his own accord. The proof at the Rule 13804 hearing showed Thrasher would not have remained at Schwab but-for Morgan Stanley's hiring him. Thrasher had decided to leave Schwab and would have left Schwab even if Morgan Stanley had not hired him.

### 3. **Morgan Stanley did not engage in unfair competition.**

"The essence of law for unfair competition is fair play." *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 758 F. Supp. 512, 527 (E.D. Mo. 1991). Under Missouri law, a defendant may be liable for unfair competition if its behavior "violate[s] society's notions of fair play and fundamental fairness." *Sales Res., Inc. v. Alliance Foods, Inc.*, 2009 WL 2382365, *7 (E.D. Mo. July 30, 2009). Here, while the proof shows Thrasher announced his new affiliation with Morgan Stanley, Schwab wants this Panel to find that such disclosure is unfair competition by Respondents. To the contrary, courts have gone so far as to say that it could be unfair for sellers to *fail* to disclose to prospective consumers particular information that is critical to an intelligent purchasing decision. *Id.*

In addition, the evidence will show that Morgan Stanley's hiring of Thrasher followed the same tradition as other lateral hires and that Morgan Stanley's actions with respect to customers serviced by Thrasher while he was employed by Schwab also comport with the notions of fair play. The evidence will show that Morgan Stanley did not act tortiously or with the intent to injure Schwab beyond normal competition. The conduct of Morgan Stanley was not unlawful or improper in any way. Thus, Schwab's unfair competition claim fails as a matter of law.

4.      **Schwab's liquidated damages provision is unenforceable.**

Morgan Stanley understands that Schwab intends to argue that it is entitled to exorbitant damages in this case pursuant to a liquidated damages provision in its contract with Thrasher.  If the Panel were to find that Schwab has proven liability – which Schwab has not, as discussed above – the Panel should not assess damages based on the liquidated damages provision, as it is an unenforceable penalty.  The provision is not a reasonable forecast of damages for the alleged harm caused and is not for a harm that is difficult to estimate accurately.  Morgan Stanley will be presenting expert testimony showing that the utmost range of damages, and only if the Panel found breach and solicitation of customers in every instance, is in the low $300,000s, and that is the high range.

Missouri has adopted the Restatement of Contracts to determine whether a liquidated damages clause is enforceable. *Grand Bissell Towers, Inc. v. Joan Gagnon Enter.*, 657 S.W.2d 378, 379 (Mo. Ct. App. 1983).  To be enforceable, "(1) the amount fixed as damages must be a reasonable forecast for the harm caused by the breach; and (2) the harm must be of a kind difficult to accurately estimate." *Diffley v. Royal Papers, Inc.*, 948 S.W.2d 244, 246 (Mo. Ct. App. 1997). "[C]ourts tend to construe such stipulations, if doubtful, as punitive in nature" and therefore will not enforce them. *Wilt v. Waterfield,* 273 S.W.2d 290, 295 (Mo. 1954).

Indeed, Missouri Courts also refuse to enforce penalty clauses that are disguised as liquidated damages. *Grand Bissell*, 657 S.W.2d at 379.  A penalty clause provides punishment for default and is designed to compel performance. *Diffley*, 948 S.W.2d at 246.  Liquidated damages, in contrast, provide compensation in the event of breach. *Id.*  As such, the provision's label is not conclusive. *Muhlhauser v. Muhlhauser*, 754 S.W.2d 2, 5 (Mo. Ct. App. 1988). Instead, courts look "to the intention of the parties as gleaned from a consideration of the

contract as a whole." *Id.*  Here, the liquidated damages provision is unenforceable because the amount fixed is grossly disproportionate to both the anticipated and actual harm alleged and the harm is not difficult to estimate accurately.[2]

## A. Requiring Thrasher to pay four percent of all assets moved from Schwab is unreasonably disproportionate to both the anticipated and actual harm caused by Thrasher's alleged breach.

The liquidated damages provision is unenforceable because the amount fixed is grossly disproportionate to both the anticipated and actual harm alleged.  Under the Restatement's first prong, "the amount fixed as damages must be a reasonable forecast for the harm caused by the breach." *Diffley*, 948 S.W.2d at 246.  Liquidated damages must approximate either the actual loss that has occurred from the breach or the loss anticipated at the time of making the agreement. *Paragon Group, Inc. v. Ampleman*, 878 S.W.2d 878, 881 (Mo. Ct. App. 1994). An amount that is unreasonably disproportionate to actual or anticipated damages does not provide a reasonable forecast of damages. *Id.* at 881 (citing *Burst v. R.W. Beal & Co.*, 771 S.W.2d 87, 90 (Mo. Ct. App. 1989)).  An unreasonably large liquidated damages provision is unenforceable. *Valentine's, Inc. v. Ngo*, 251 S.W.3d 352, 354 (Mo. Ct. App. 2008).

Fixing damages at 4% (in this case $1.43 million) of all assets managed by Thrasher that moved from Schwab to Morgan Stanley is grossly disproportionate to the harm anticipated at the time the parties made the agreement.  Morgan Stanley's expert analyzes the amount of assets

---

[2] Schwab's liquidated damages provision is also unenforceable because it is not fixed on the basis of compensation. If damages are not fixed on the basis of compensation then they are construed as a penalty clause and are unenforceable.  *Diffley*, 948 S.W.2d at 247.  A liquidated damages provision is not fixed on the basis of compensation when it uses the same formula to calculate damages for two different breaches that would ordinarily require two substantially different methods of compensation. *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1347-49 (Fed. Cir. 2004). Here, the liquidated damages provision is calculated based on the amount of assets that transferred from Schwab, but is applied to breaches that are wholly unrelated to the transfer of accounts.  For example, if an advisor discloses confidential information, the company incurs damages of a different kind than those incurred from the lost return on transferred assets due to solicitation.  Nevertheless, the liquidated damages provision uses exactly the same formula to calculate "damages" in both types of breaches.  The provision is not fixed on the basis of compensation because it uses the same measure of damages for two substantially different harms.

transferred and factors in the profit margin associated with those assets, the proper attrition rate associated with those assets, and also measures for present day value. The result shows that any damages, assuming liability in every instance of contact by Thrasher, are just north of $300,000 on the high end. This is nearly 5 times less than the $1.43 million sought by Schwab. Based on this high end measure of damages, it is not reasonable to believe that Schwab and Thrasher anticipated damages near 4% of the assets that might transfer in the event of a breach.[3]

The proof will also show that, of the accounts had no familial or close friend relationship with Thrasher,   $31,858,381 in assets moved from Schwab to Morgan Stanley. To the contrary, Schwab's liquidated damage calculation is based on more than $35 million transferring and includes damages for the transfer of accounts that were held by personal friends and family members of Thrasher. Schwab also includes a $283,000 account that coincidentally moved from Schwab to Morgan Stanley during the last week the injunction was in effect that is not being managed by Thrasher at Morgan Stanley. These are accounts that Schwab cannot reasonably argue moved as a result of improper contact or solicitation. These accounts, which were excluded by Morgan Stanley's expert, make up 11% of the assets transferred to Morgan Stanley.

Second, and more importantly, Schwab's liquidated damages calculation does not consider that many of the assets would have moved to Morgan Stanley even without any alleged solicitation by Thrasher. Morgan Stanley's expert conducted a customer survey the results of which confirm: (1) Thrasher did not ask customers to transfer to Morgan Stanley[4] and (2) the

---

[3] Morgan Stanley anticipates that Schwab will attempt to rationalize the 4% penalty by calculating its alleged lost profits. Based on Schwab's disclosed information, Schwab's lost profits analysis is flawed because it overstates the assets transferred, overstates account profitability, understates account attrition rates and fails to discount losses to present value.

[4] Fifty-four of the 57 customers that responded to this question on the survey report that Thrasher did not ask them to move their account, but just informed them of the change of employer; 1 customer did not remember; and 2 customers reported that Thrasher neither asked them to move their account nor informed them of the change in employer.

customers would have contacted Thrasher even if they had only received a written announcement in the mail.[5]  Schwab's damages calculation just assumes all transferred assets must have transferred as a result of some breach by Thrasher and that is legally and factually unjustified.

Thus, Schwab's claim for 4% of assets transferred as damages is grossly disproportionate to the anticipated and actual harm and is in no way a reasonable measure of anticipated damages.

### B.  <u>The liquidated damages provision is unenforceable because the harm caused is not difficult to estimate.</u>

Under the Restatement's second prong, liquidated damages are only enforceable when they are for a harm that is "of a kind difficult to accurately estimate." *Diffley*, 948 S.W.2d at 246. "[D]ifficulty in measuring the extent of damages at the time of contracting is not sufficient." *Monsanto*, 363 F.3d at 1345.  Damages must be difficult to measure at the time the breach is discovered.  *Id.*

The harm caused by Thrasher's alleged solicitation is not difficult to estimate accurately. As referenced above, the proof will show that one can calculate Schwab's annual profit margin is on assets.  By adjusting for the proper, natural attrition of accounts and discounting for present value, the panel can arrive at a reasonable calculation of lost profit.  In this case, Morgan Stanley's expert opines that, only when assuming liability in every instance, that range is somewhere between zero and $338,000.

---

[5] Fifty of the 56 customers that responded to this question on the survey reported that "yes" they would have called Thrasher if they had received only a written announcement; 4 customers reported "probably yes;" and 2 customers reported "maybe."

## IV.  <u>Conclusion</u>

For the foregoing reasons, Morgan Stanley requests that the Panel dismiss Schwab's claims against Morgan Stanley in this matter, and award Morgan Stanley all recoverable fees and costs for having to defend these claims.

Respectfully submitted,

Salvador M. Hernandez
Cassie N. Madden
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
(615) 320-3700

Counsel for Morgan Stanley Smith Barney LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing is being served via Federal Express to:

FINRA Dispute Resolution
Attn: Elizabeth A. Muldoon
55 West Monroe Street, Suite 2600
Chicago, IL 60603-1003        (three copies and an original)

Susan M. Guerette
James P. McLaughlin
Fisher & Phillips LLP
Radnor Financial Center
201 King of Prussia Rd., Suite 650
Radnor, Pennsylvania 19087

S. Francis Baldwin
Attorney at Law
9909 Clayton Rd., Suite 226
St. Louis, MO  63124

on this 25th day of November, 2013

**EXHIBIT "B"**

HPR 26 '00 16:27 FR MSDW LEGAL          212 392 2223 TO 914102966654      P.02/14
Apr-04-00 14:22   From-Neal.Gerberas=Eisenberg

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MERRILL LYNCH, PIERCE, FENNER          )     No. 99 C 5968
& SMITH, INC.,                         )
                                       )
              Plaintiff,               )
                                       )     Chicago, Illinois
      v.                               )     September 10, 1999
                                       )     3:52 p.m.
PAUL J. OBLON, CARLOS A. GONZALEZ,     )
CHRIS MARZEC, MAURICE MATHY,           )
JASON STALLMANN, JEFF THORNE,          )
SCOTT M. ZAGURSKY, and TODD            )
ZAGURSKY,                              )
                                       )
              Defendants.              )     Motion

APPEARANCES:

For the plaintiff:        Lord, Bissell & Brook,
                          by:  RONALD M. LEPINSKAS and
                               JOSEPH M. TALARICO,
                          115 South LaSalle Street,
                          Chicago, Illinois 60603


For the defendants:       Neal, Gerber & Eisenberg,
                          by:  H. NICHOLAS BERBERIAN,
                               ROBERT J. MANDEL, and
                               L. ROGER BOORD,
                          Two North LaSalle Street,
                          Chicago, Illinois 60602

JAMES P. DOLAN
OFFICIAL REPORTER — U.S. DISTRICT COURT
219 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60604

2

1          THE CLERK:  99 C 5968, Merrill Lynch v. Oblon,

2     et al.

3          MR. LEPINSKAS:  Good afternoon, your Honor.  Ron

4     Lepinskas on behalf of plaintiff, Merrill Lynch.

5          MR. BERBERIAN:  Good afternoon, your Honor.  Nick

6     Berberian on behalf of the defendants.

7          THE COURT:  Good afternoon to both of you.

8               I've had an opportunity to review the

9     complaint and the memorandum in support of the motion for

10    temporary restraining order, and briefly I've had a chance

11    to review the defendants' response.

12              Before we get into a discussion of the

13    arguments that you desire to make in connection with your

14    respective positions, have you talked with one another about

15    settling the case at all, or settling this issue?

16         MR. LEPINSKAS:  Your Honor, if I may, up until

17    yesterday, when our district manager first found out about

18    this situation, --

19         THE COURT:  Yes?

20         MR. LEPINSKAS:  -- he attempted to talk with -- as

21    you can see from the affidavit --

22         THE COURT:  Right.

23         MR. LEPINSKAS:  -- Mr. Graham tried to talk with

24    these people, --

25         THE COURT:  I reviewed that, as well.

APR 26 '00 16:27 FR MSDW LEGAL          212 392 2223 TO 914102966654          P.04/14

Apr-04-00  14:22      From-Neal,Gerber&Eisenberg

3

1       MR. LEPINSKAS:  -- right -- and under advice of

2   counsel, supposedly, one of the defendants said that they

3   weren't willing to talk about these matters, so --

4       THE COURT:  Right.  But now that they've got

5   counsel, can counsel see if you can work something out?

6       MR. BERBERIAN:  Oh, we're more than delighted to

7   try to do so, your Honor.

8       That conversation yesterday was

9   confrontational.  They were threatened with all kinds of

10  legal action.  It was not the kind of a conversation

11  conducive to leading to any kind of resolution.

12      THE COURT:  Oh.  Well, --

13      MR. LEPINSKAS:  Your Honor, I'd be happy to do so

14  as long as we reach closure on this matter today, if

15  possible.

16      THE COURT:  Why don't we sit down right now and

17  see if we can work something out.

18      MR. LEPINSKAS:  I'd be happy to do so, your Honor.

19      THE COURT:  I've got a jury out.  I'm bringing the

20  jury back in to see what their desires are, whether they

21  want to continue to deliberate or not, at 4:30.  I can

22  devote between now and 4:30 to you folks.

23      MR. LEPINSKAS:  Okay.

24      THE COURT:  If it's necessary that we conduct a

25  further hearing after I send the jury home in this case, we

APR 04 '00 16:26                                    3122691747      PAGE.04

APR 26 '00 16:28 FR MSDW LEGAL        212 392 2223 TO 914102966654        P.05/14
Apr-04-00 14:22    From-Neal.Gerber&Eisenberg

4

1    can do that, as well.  I'm hearing this case for Judge

2    Aspen, who is the assigned judge to this case.  I think we

3    can probably work something out.

4               MR. LEPINSKAS:  I'd be happy --

5               THE COURT:  There's a lot of history in this type

6    of activity, and I've often thought that there really ought

7    to be some guidelines for everyone, and maybe we can sit

8    down and informally work out those guidelines.

9               MR. BERBERIAN:  Your Honor, the guidelines our

10   clients tried to follow are the very guidelines that you set

11   forth in the Pinzker case.

12              THE COURT:  I understand.  All of these cases are

13   fact-specific.

14              MR. LEPINSKAS:  Right, and, obviously, we think

15   it's different, but if you want to go in chambers, I'd be

16   happy to join you with counsel.

17              THE COURT:  I was actually going to sit down out

18   here in the courtroom because we've got so many people, but,

19   yes, why don't we come on back into chambers.  I'll have my

20   clerk come on back as well.

21              You can come get me at 4:30 when we bring the

22   jury out.

23         (Conference off the record.)

24              THE CLERK:  99 C 5968, Merrill Lynch v. Oblon,

25   et al.

APR 26 '00 16:28 FR MSDW LEGAL          212 392 2223 TO 914102966654          P.06/14
APR-04-00 14:66   FROM MSDW LEGAL

5

1      MR. BERBERIAN:  Good afternoon, your Honor.  Nick

2   Berberian on behalf of defendants.

3      MR. LEPINSKAS:  Good afternoon, your Honor.  Ron

4   Lepinskas on behalf of plaintiff, Merrill Lynch.  At my side

5   is Tom Lydon from Merrill Lynch.

6      THE COURT:  Yes.  Good afternoon again to all of

7   you.

8      Since we first called the case this afternoon

9   and I suggested we have a settlement conference, we have

10   engaged in that settlement conference, and have been engaged

11   in that settlement conference -- you lawyers have been -- I

12   had to turn my attention to other matters.

13      We worked on the parameters of a possible

14   settlement, but it appears that that cannot be accomplished.

15   I do understand, though, that what was accomplished is that

16   a hearing on the defendants' request for arbitration with

17   the NASD has been commenced -- or has been arranged, and

18   will take place on Thursday or Friday of next week.

19      Is that everyone else's understanding, as

20   well, the 16th or 17 of September?

21      MR. BERBERIAN:  On behalf of the defendants, that

22   is correct, your Honor.

23      MR. LEPINSKAS:  Well, on behalf of the plaintiffs,

24   I don't know that I can commit the particular lawyer who

25   will be arguing to Thursday or Friday, but that is our

6

```
 1        intention at this point.
 2                THE COURT:  Okay.
 3                MR. LEPINSKAS:  I mean that date may give by a day
 4        or two.
 5                THE COURT:  Okay.  Well, my understanding is that
 6        Mr. Berberian contacted the people there, and whoever he
 7        talked with, that was the available time, and it will take
 8        place shortly, so that process has been at least commenced.
 9                I've reviewed your respective materials, and
10        your motions to file a brief in support of 15 pages, both
11        sides, will be granted, and I understand that there is some
12        further comment that counsel desire to present.  In view of
13        the hour, it being 5:14 by the clock on the wall, I would
14        ask that you keep them as brief as possible, but I certainly
15        want to hear everything you desire to say.
16                MR. LEPINSKAS:  Your Honor, further comment from
17        the plaintiff will come from Mr. Lydon.
18                If you want to approach the podium --
19                THE COURT:  All right, Mr. Lydon, I understand you
20        got a phone call and you came over to the courthouse to
21        assist me in evaluating this case.
22                MR. LYDON:  Right, Judge, I did.
23                THE COURT:  What is your position with Merrill
24        Lynch?
25                MR. LYDON:  I'm the district administrative
```

HAR 26 '00 16:28 FR MSDW LEGAL          212 392 2223 TO 914102966654        P.08/14
APR-04-00  14:23    FROM:MSDW LEGAL DEPARTMENT

7

1   manager with the Chicago District of Merrill Lynch, your

2   Honor.

3          THE COURT:  All right, and is Mr. Graham a

4   superior of yours?

5          MR. LYDON:  Right, Mr. Graham is the district

6   director.  I report to him.

7          THE COURT:  He was the affiant in these

8   proceedings, --

9          MR. LYDON:  Correct.

10         THE COURT:  -- and provided me with an affidavit,

11  which I've reviewed.

12         MR. LYDON:  Right.

13         THE COURT:  Go ahead.

14         MR. LYDON:  Your Honor, I'm not an attorney, --

15         THE COURT:  That's okay.

16         MR. LYDON:  -- and I don't purport to be, but if I

17  can just very briefly state our position, it's our position,

18  Judge, that our clientele is our most important asset.

19  These clients were developed utilizing Merrill Lynch

20  resources, research, our good name, our reputation, and it

21  is our position, your Honor, that, although we can't say

22  that we own anything, and the clients -- it's a free country

23  -- they can go where they want, it is our position that the

24  clients were -- are Merrill Lynch clients.

25         Again, Judge, I'm not going to interpret our

8

1    contract, but we feel that there are restrictions on the

2    contact of our clients.  We would like an opportunity to

3    show -- to speak to our clients -- our clients -- and

4    explain to them.  Once again, they obviously are our clients

5    for a reason, the value of Merrill Lynch.

6                    In particular, Judge, we have something

7    called the Merrill Lynch Unlimited Advantage Program, which

8    is a new program.  Merrill Lynch is changing the industry.

9    It's an entirely new pricing structure, which is very, very

10   advantageous to our clients.

11                   What we are asking for, your Honor, is simply

12   an opportunity to speak to our clients, to explain to them

13   the advantages.  They may have already been spoken to by the

14   departing FCs, but we feel very strongly, your Honor, that

15   these are developed with Merrill Lynch resources.  I will

16   not -- I'm not going to say anything bad about Smith Barney.

17   Smith Barney is a good firm.  I'm not here to do that, your

18   Honor.  I'm just here to appeal to your good judgment, that

19   these are -- we consider these our clients -- quote -- and

20   we would just like the opportunity to reach them, and we

21   would like our employees, our former employees, just to live

22   up to the terms of the agreement that they signed.

23                   THE COURT:  All right, well, I appreciate that.

24                   Does anyone desire to ask any questions of

25   Mr. Lydon?  Even though he is not under oath, I accept his

Apr-04-00  14:23   From-Neal, Gerber&Eisenberg

9

1    word as his word.

2              MR. BERBERIAN:  We do not, your Honor.

3              THE COURT:  Okay.

4              All right, anything further you desire to

5    say, Mr. Lydon?

6              MR. LYDON:  Your Honor, we feel very strongly

7    about this.  I jumped out of my office and came over here.

8              THE COURT:  I understand.  I used to office in the

9    Sears Tower, myself, so --

10             MR. LYDON:  And it just -- you know, we do have

11   the clients' best interests at heart here, and I would hope

12   that our former employees do, as well.  I don't know if they

13   do or not, Judge.

14             THE COURT:  All right, well, thank you, and I

15   appreciate your coming over.

16             All right, is there anything further that

17   counsel desire to say in support of or in opposition to the

18   motion?

19             MR. LEPINSKAS:  Your Honor, you've heard my pitch

20   again and again that this is an orchestrated raid, and that

21   all of these are solicitations, all of these contacts.

22   There is no other straight-face purpose that they could come

23   up with to say why they're doing what they're doing.

24             I understand your Honor has his good reasons

25   for what he's doing, and I respectfully disagree.

APR 26 '00 16:29 FR MSDW LEGAL          212 392 2223 TO 914102966654          P.11/14
Apr-04-00  14:24      From meal aveue el newswe

10

1          THE COURT:  All right.  We had a lot of discussion

2    in the settlement conference off the record regarding the

3    facts and respective positions, but my understanding of the

4    facts at this point are that the defendants have sent to the

5    customers whose names and addresses they remember a notice

6    that was identical in nature and different only as to the

7    name of the broker, as was utilized in the Pinzker case that

8    was brought before me in December of last year.

9                   Based on that fact, the announcement of the

10   broker that the broker has gone to Salomon Smith Barney,

11   providing the phone number and other information -- I don't

12   have a copy of the notice that was shown to me at the

13   settlement conference in front of me -- but if that's the

14   nature of the notice that's provided, it is my ruling that

15   that type of contact is not for the purpose of inviting,

16   encouraging, or requesting any account to transfer from

17   Merrill Lynch, or to open a new account at Salomon Smith

18   Barney, or to otherwise have the customer of Merrill Lynch

19   discontinue its patronage from Merrill Lynch, or its

20   business relationship with Merrill Lynch.

21                  That notice is for the purpose of informing

22   the customer that the broker with whom the customer had been

23   working at Merrill Lynch has moved to Salomon Smith Barney,

24   and since it's for the purpose of informing, and since

25   informing is not one of the restricted purposes in the

HPR 26 '00 16:30 FR MSDW LEGAL        212 392 2223 TO 914102966654        P.12/14

11

1   Merrill Lynch financial consultant employment agreement, I
2   believe that that type of a contact is not a violation of
3   that employment agreement by the defendants.
4              Likewise, to answer Mr. Lydon's comments,
5   Merrill Lynch has every right to contact these customers of
6   Merrill Lynch, to solicit these customers of Merrill Lynch,
7   to tell the customers of Merrill Lynch about the new
8   arrangement that Mr. Lydon commented on, to tell the
9   customers of Merrill Lynch that their accounts will now be
10   serviced by whomever it is at Merrill Lynch that will be
11   servicing these accounts, to provide these Merrill Lynch
12   customers with inducements to remain at Merrill Lynch, and
13   the defendants cannot invite, encourage, or request any of
14   these Merrill Lynch customers to move their accounts,
15   transfer their accounts, or open a new account, or
16   discontinue their patronage of Merrill Lynch.  So the
17   advantage still remains with Merrill Lynch with regard to
18   these customers.
19              The employment agreement does not prohibit
20   contacts that are informative contacts, contacts that merely
21   inform the customer.  And since the Merrill Lynch employment
22   contract deals with contacts or communications, one must
23   look to the contact and the communication and the purpose of
24   the contact or communication, and if the purpose is
25   something other than inviting, encouraging, or requesting

1   any account to transfer or open a new account or otherwise

2   discontinue its patronage at Merrill Lynch, it is not a

3   violation of paragraph 2 of the Merrill Lynch employment

4   agreement.

5           There has been no showing at this point that

6   the defendants have in their possession -- no showing --

7   there have been allegations -- but there's been no showing

8   that they have in their possession any confidential

9   information or records of Merrill Lynch that they are using

10   in any manner to further their business at Smith Barney, and

11   there's no indication or no proof, other than just

12   allegations, that these defendants have divulged, or have

13   agreed to divulge, any information to any third party that

14   is confidential information at Merrill Lynch.

15           And so at this point, even though these

16   defendants have acknowledged in the employment agreement the

17   extreme value to Merrill Lynch of confidential information,

18   there is no showing at this point that would cause me to

19   believe that, on the merits of the case, Merrill Lynch would

20   prevail.

21           I believe that the public has a right to know

22   when a broker leaves one company and goes to another

23   company, and I believe that at this point there has been no

24   showing that the defendants have done anything other than to

25   inform their customers, Merrill Lynch's customers, of their

13

1    change of employment.

2             There is nothing that violates the employment

3    agreement if the former Merrill Lynch employee accepts

4    business that was neither invited, encouraged, or requested,

5    as long as there was not a solicitation, as long as there

6    was not an invitation or an encouragement or a request to

7    transfer, or open a new account, or otherwise discontinue

8    patronage at Merrill Lynch.

9             And the public has a right to change brokers

10    at any point in time.  Mr. Lydon said it.  As he said,

11    people can go wherever they want.

12             And I realize that this is important, that

13    this is the lifeblood of Merrill Lynch, but at this point

14    there isn't sufficient evidence from the affidavit of Mr.

15    Graham or any of the other information provided to me that

16    these defendants have violated their agreement or any of the

17    laws that restrict their activities at this point.

18             Anything else?

19    MR. LEPINSKAS:  Your Honor, if I may be heard,

20    first I'd like to thank you for your time, patience, and

21    energy today.  It's no fun, I know, at the end of a long

22    week.

23             Mr. Lydon here would like to add -- with the

24    Court's indulgence -- Mr. Lydon would like to add a further

25    comment.

**EXHIBIT "C"**

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE LAKE SUPERIOR COURT |
| | ) SS: | CIVIL DIVISION ROOM NO. SEVEN |
| COUNTY OF LAKE | ) | SITTING AT CROWN POINT, INDIANA |

MERRILL LYNCH, PIERCE, FENNER & )
SMITH INCORPORATED,. )
                          )
    Plaintiff,               )
                          )
v.                           )
                          )
MUNTHER B. ABDALLAH &      )
RICHARD M. SOFIAK, .        )
                          )
    Defendants.          )

CASE NO. 45D11-0608-PL-77

## Filed in Open Court

AUG 17 2006

*Thomas R. Philpot*
CLERK LAKE SUPERIOR COURT

### ORDER DENYING PLAINTIFF'S REQUEST
### FOR A PRELIMINARY INJUNCTION

    This matter came before the Court on August 11, 2006, on Plaintiff Merrill
Lynch, Pierce, Fenner & Smith Inc.'s request for a preliminary injunction. Plaintiff
appeared, by representative and counsel, and Defendants Richard Sofiak and Munther
Abdallah appeared, in person and by counsel. Evidence was presented and argument was
heard, and the Court, being duly and fully advised, now finds and orders as follows:

### Findings

    1.     Sofiak and Abdallah are licensed securities brokers who provide financial
planning and other advisory services to their customers.

    2. .     Sofiak has been a licensed securities broker since 1988. Sofiak joined
Merrill Lynch in 1991 as a financial advisor in Merrill Lynch's Merrillville office.

    3.     Abdallah joined Merrill Lynch in 1993 as a financial advisor in its
Merrillville office.

4.    Merrill Lynch did not present either Sofiak or Abdallah with a pre-existing book of securities customers to serve. Sofiak and Abdallah brought clients, relationships and contacts to Merrill Lynch. Virtually all of the clients Sofiak and Abdallah served at Merrill Lynch came to them as a result of their personal efforts in cold-calling, personal presentations that they made, and referrals from existing customers who were satisfied with their work and encouraged their family and friends to do business with them.

5.    In late 2004, Merrill Lynch drafted a Protocol For Broker Recruiting (the "Protocol"). The Protocol was intended to facilitate client choice and eliminate the inconvenience to clients that invariably results from litigation, like these proceedings, that occurs between firms and securities brokers when brokers move employment from one brokerage firm to another. A principal goal of the Protocol is to further clients' freedom in selecting, maintaining a relationship with, and communicating with the broker of their choice.

6.    Merrill Lynch, Salomon Smith Barney, UBS Financial Services and multiple other brokerage firms are signatories to the Protocol. Morgan Stanley is not a signatory to the Protocol.

7.    Under the Protocol, a departing broker may take, among other information, clients' names, addresses, telephone numbers and account types. A departing broker is then free to use this customer information to solicit customers whom the broker served at his or her former firm.

8.    Since entering into the Protocol, Merrill Lynch allows departing brokers to remove customer information such as names, addresses, phone numbers, e-mail

2

addresses, and account titles for customers that the brokers served, and to use that information to solicit those customers if the departing brokers join a brokerage firm that signed the Protocol. Merrill Lynch allows departing brokers to remove this information notwithstanding any restrictive covenants the departing brokers may have signed, including nonsolicitation covenants and various policies or guidelines regarding customer privacy and confidentiality.

9.     As a result of dissatisfaction with Merrill Lynch, Sofiak and Abdallah investigated employment opportunities with various brokerage firms.

10.     Sofiak and Abdallah resigned from their employment with Merrill Lynch on August 4, 2006 and joined Morgan Stanley DW Inc. ("Morgan Stanley"). Sofiak and Abdallah were offered lucrative compensation packages from brokerage firms that were signatories to the Protocol, including Smith Barney and Wachovia. Sofiak and Abdallah chose Morgan Stanley because they believed they would receive superior support services for them and for their clients.

11.     Immediately after Sofiak and Abdallah's resignation, Merrill Lynch instituted this proceeding and attempted to obtain a temporary restraining order and preliminary injunction against Sofiak and Abdallah. Merrill Lynch's request for a temporary restraining order was denied.

12.     Sofiak did not enter into any nonsolicitation agreement with Merrill Lynch. Abdallah entered into a nonsolicitation agreement when he joined Merrill Lynch in 1993, approximately eleven (11) years before Merrill Lynch instituted the Protocol.

3

13.     Neither Sofiak nor Abdallah removed copies or originals of any Merrill Lynch documents.  Sofiak and Abdallah did not download or remove any electronic data from Merrill Lynch.  Sofiak and Abdallah did not alter, sabotage or conceal any Merrill Lynch document or electronic data.  Sofiak and Abdallah did retain handwritten names, addresses and telephone numbers of the customers they individually served while at Merrill Lynch.

14.     After their resignation from Merrill Lynch, Sofiak and Abdallah sent announcement cards that informed their clients of the fact that they had joined Morgan Stanley and provided their new mailing address and individual telephone numbers. Sofiak sent announcement cards with his contact information only to the clients whom he had served.  Abdallah sent announcement cards with his contact information only to the clients he had served.  Sofiak and Abdallah did not include any additional information, such as account transfer packages or information, with their announcement cards.

15.     After their resignation, Sofiak and Abdallah also telephoned their existing clients to inform them of their new employment with Morgan Stanley.  The phone calls were informational in nature only; they were not solicitations to transfer accounts.

16.     Immediately after Sofiak and Abdallah's resignation, Merrill Lynch assembled a team of management representatives and an unknown number of brokers to solicit Sofiak's largest customers and Abdallah's largest customers.  Merrill Lynch conducted these calls on Saturday, August 5, during the daytime and evening hours. Merrill Lynch was successful in contacting many of Abdallah's customers before they received either Abdallah's announcement card or an informational call from Abdallah.

4

17.    Despite suspicions that Sofiak and Abdallah had altered client information to make it difficult for Merrill Lynch to contact clients, the Merrill Lynch representative was able to locate client contact information using public resources, such as the internet, that she could not find in the Merrill Lynch computer system.

18.    Neither Sofiak nor Abdallah took any actions to interfere with Merrill Lynch's efforts to retain the business of their personal clients or to compete for the business of prospects.

19.    Sofiak and Abdullah made preparations to compete against Merrill Lynch upon their resignations. Neither Sofiak nor Abdallah actually competed against Merrill Lynch until after their resignation.

20.    Sofiak and Abdallah would suffer significant harm if the requested injunctive relief were granted, as would customers whose choice has been to continue to receive brokerage services from Sofiak and Abdallah.

21.    In contrast, Merrill Lynch will not suffer significant harm from the denial of injunctive relief, given that the brokers followed the Protocol that Merrill Lynch has expressly agreed is reasonable and in the best interest of brokerage customers in circumstances such as these.

22.    Merrill Lynch admitted at the hearing that if Sofiak or Abdallah had joined a brokerage firm that is a signatory to the Protocol, Merrill Lynch would not have instituted this emergency proceeding.

## Conclusions Of Law

1.      Merrill Lynch failed to establish the necessary four factors to obtain

injunctive relief:

a.      Merrill Lynch has not demonstrated that its remedies at law are

inadequate and that it will be irreparably harmed in the absence of

injunctive relief;

b.      Merrill Lynch has not demonstrated a likelihood of success at trial

by establishing a *prima facie* case on its claims;

c.      Greater harm would result to the individuals, Sofiak and Abdallah,

from the granting of injunctive relief than to Plaintiff were

injunctive relief granted; and

d.      The public interest would be better served by denying the request

for injunctive relief.

*Ackerman v. Kimball Int'l, Inc.*, 634 N.E.2d 778, 784-85 (Ind. Ct. App. 1994), *citing*

*Whiteco Industries, Inc. v. Nicholick*, 549 N.E.2d 396, 397 (Ind. Ct. App. 1990).

### No Irreparable Injury

2.      First, loss of customer names, addresses and phone numbers (even

combined with solicitation) is not an "irreparable" injury to Merrill Lynch. The Protocol

shows Merrill Lynch's contemplation of and approval of the actions alleged.

3.      Merrill Lynch's claim of "present and future economic loss" is insufficient

to support a finding of irreparable injury. Economic loss, even where substantial, does

not constitute irreparable injury. *See Wagler Excavating Corp. v. McKibben*

6

*Construction, Inc.*, 679 N.E.2d 155, 158 (Ind. Ct. App. 1997); *Scales v. Hospitability House of Bedford*, 593 N.E.2d 1283, 1286 (Ind. Ct. App. 1993). Detailed records are maintained that will allow Merrill Lynch to quantify and document any economic harm it actually has suffered. *See Merrill Lynch v. de Liniere*, 572 F.Supp. 246, 249 (N.D. Ga. 1983) ("The real loss is in commission revenue generated by [the departing broker] from former . . . customers, and that can be readily calculated from the commissions he and his new firm derived from [those customers].").

     4.     Merrill Lynch's assertions of loss of "good will" or potential "office stability" do not constitute irreparable harm sufficient to warrant entry of a preliminary injunction. *See* Def. Ex. 14 at p. 62, *First of Michigan Corporation v. J.J.B. Hilliard, W.L. Lyons, Inc*, File No. 1:97-CV-947, (W.D. Mich., Nov. 13, 1997) ("[E]very time there is a spat or dispute between business entities, there is always the possibility of loss of goodwill as a result of publicity and other things. So loss of goodwill, I would submit, is not a very sound basis to premise injunctive relief on, particularly when one sees that this is a money business."); Def. Ex. 12 at p. 34, *Mania v. Merrill Lynch Pierce Fenner & Smith, Inc.*, Case No. 93-CV-74226-DT (E.D. Mich, October18, 1993) ("The third concern expressed by Merrill Lynch is that injunctive relief is necessary to protect the stability of the Bloomfield Hills office and to discourage other competitors from buying away Merrill Lynch employees. Well, I think that complaint amounts to not much more than remarks that are made about and over natural competition that exists in the marketplace.").

7

## No "Substantial Likelihood" Of Success On The Merits

5.    Alleged Breach Of Contract - Sofiak. Merrill Lynch did not demonstrate a "substantial chance" of success in showing that Sofiak breached any contract with Merrill Lynch. First, Sofiak never entered into a restrictive covenant or employment contract with Merrill Lynch. Merrill Lynch cannot prevent Sofiak from contacting or even soliciting his former customers. Merrill Lynch may not use this proceeding to obtain contractual rights it was unable to obtain through good-faith bargaining with Sofiak.

6.    Merrill Lynch's employee manuals or similar policy documents – none of which contained a restrictive covenant – do not entitle it to the relief it seeks from this Court. *See Orr v. Westminster North Village North, Inc.*, 689 N.E.2d 712, 721 (Ind. 1997) (finding that an employee handbook did not create unilateral contract); *see also Raymond James & Assoc, Inc. v. Leonard & Co.*, 411 F. Supp. 2d 689, 693 (E.D. Mich. 2006) (denying injunctive relief against a former broker that had not executed any non-solicitation or non-compete agreement).

7.    Alleged Breach Of Contract – Abdallah. Covenants not to compete are restraints upon trade that are not favored by the law; as a result, they are strictly construed against the drafter/employer. *Harvest Ins. Agency, Inc. v. Inter-Ocean Ins. Co.*, 492 N.E.2d 686, 688 (Ind. 1986). *See Economation, Inc. v. Automated Conveyer Sys., Inc.*, 694 F. Supp. 553, 560 (S.D. Ind. 1988) ("Given the underlying basis in Indiana law favoring competition, the restrictions on former employees must be narrowly drawn.").

8

8.      The restrictive covenant contained in Mr. Abdallah's employment contract does not prohibit post-termination, change-of-employment, informational contacts with clients. Rather, Merrill Lynch's agreement with Mr. Abdallah only proscribes "solicitation."

9.      There is no evidence that Mr. Abdallah solicited any of his clients to leave Merrill Lynch and transfer their accounts to Morgan Stanley. There is no evidence that either Sofiak or Abdallah initiated any contact with their clients other than to disclose to them the fact of their change of employment. Courts throughout the country have held that a mere announcement or informational contact does not constitute a solicitation for purposes of enforcing a non-solicitation agreement. *See, e.g., Wells v. Merrill Lynch, Pierce, Fenner & Smith,* 919 F. Supp. 1047, 1053 (E.D. Ky. 1994) ("a mere informational contact between the [broker] and any former client does not constitute a 'solicitation' under the [Merrill Lynch] employment agreements."); *Merrill Lynch, Pierce, Fenner & Smith v. O'Connor,* 194 F.R.D. 618, 620 (N.D. Ill 2000) (unlawful and unreasonable for Merrill Lynch to prevent a broker from giving former customers notification of his new address); *Merrill Lynch v. Hafner,* Defs. Ex. 1 at 5-7 (N.D. Ill. Jan. 24, 2001) ("an informational communication about where the person who has been handling the account has gone or now is, is something that's separate from solicitation").

10.     Indiana requires that a restrictive covenant be "necessary to protect a legitimate business interest." *Wagler Excavating Corp. v. McKibben Construction, Inc.,* 679 N.E.2d 155, 157 (Ind. Ct. App. 1997). Indiana courts "do not hesitate to strike down any such restrictive covenants which are the least bit overly broad with respect to the 'protectable interest' at stake." *Id.; Slisz v. Munzenreider Corp.,* 411 N.E.2d 700, 705

9

(Ind. Ct. App. 1980). Here, the Protocol shows that Merrill Lynch has agreed to allow departing brokers to retain the customer information at issue and use the information to solicit the departing broker's clients. As such, Merrill Lynch failed to establish a protectable business interest in preventing Abdallah from possessing his customers' names, addresses, and phone numbers.

11. This covenant is also overly broad in light of testimony establishing Abdallah's efforts to obtain his clients. *See Merrill Lynch v. Novak*, No. 01-CV-207, tr. at 9-10, (Wis. Cir. Ct. Jan. 9, 2001) ("[T]here is a good chance that it is going to invade the area of clients who are in fact recruited by, developed by, serviced by, and loyal to the brokers directly. [The restrictive covenant therefore] is unnecessarily broad and goes beyond the legitimate interests that the employer has in protecting itself.") (Defs. Ex. 11).

12. No Conversion Of Proprietary Or Trade Secret Rights. Merrill Lynch is not likely to succeed on its claim that Sofiak and Abdallah converted "proprietary and trade secret rights and interest" (Count III). Indiana's Uniform Trade Secret Act ("IUTSA") defines "trade secret" to mean "information" that: "(1) derives independent economic value, actual or potential, for not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) subject of efforts that are reasonable under the circumstances to maintain its secrecy." Ind. Code § 24-2-3-2.

13. "Given this protocol that Merrill Lynch has invited other brokers 'to adopt . . . as the industry standard,' it cannot be said that Merrill Lynch is likely to succeed on its trade secret claim when it does not treat such client identifying information as a secret

when brokers move to firms that are a part of the protocol." *Merrill Lynch, Pierce,*

*Fenner & Smith, Inc. v. Swearingen, et al.,* Case No. 3-04-CV-2668-B (N.D. Texas

December 27, 2004), p. 4, Defs. Ex. 17. For the same reasons, the customer information

is not "proprietary."

    14.   <u>No Breach Of Fiduciary Duty.</u> In Indiana, employees have a "privilege"

to prepare to compete against their employer. *See Economation, Inc. v. Automated*

*Conveyor Systems, Inc.,* 694 F. Supp. 553, 557 (S.D. Ind. 1988) (recognizing "the

privilege of employees to prepare to compete against their employers without fear of

breaching their fiduciary duty"). The evidence shows that Sofiak and Abdallah did

nothing more than prepare to compete prior to their resignation. Thus, Merrill Lynch

likely will not succeed on its claim for breach of fiduciary duty.

    15.   <u>No Unfair Competition.</u> Finally, Merrill Lynch likely will not succeed on

its claim for unfair competition. Merrill Lynch has agreed to compete with a multitude of

brokerage firms in the identical manner complained of here. *See Woodward Ins., Inc. v.*

*White,* 437 N.E.2d 59, 67 (Ind. 1982) (finding no unfair competition where plaintiff took

customer information available from other sources and solicited his customers after his

termination). Merrill Lynch has claimed that the Protocol procedures are the "industry

standard."

### The Balance Of The Harms Favors A Denial Of Injunctive Relief

    16.   "Brokerage firms can survive the denial of an injunction far more readily

than departing employees can survive its issuance." *Morgan Stanley DW, Inc. v. Frisby,*

163 F. Supp. 2d 1371, 1381 (N.D. Ga. 2001). Sofiak and Abdallah's livelihood depend

11

on their relationships with clients. The entry of an injunction would be catastrophic to those personal relationships and interaction. *See de Liniere*, 572 F. Supp at 249 ("If an injunction was granted, [the broker] may be prevented from serving the customers for whom he has worked for over the last two years. It would leave him with no client base in a business that thrives on commissions from regular clients. . . . damage to [the broker] while he waited ultimately to prevail would be catastrophic as a result of the loss"). Further, this Court is "hesitant to believe that the departure of two brokers will so damage Plaintiff's business as to tip the equities into its favor." *Frisby*, 163 F. Supp. 2d at 1382.

## The Public Interest Favors Denial Of Injunctive Relief

17.     Contrary to Merrill Lynch's assertions, the entry of an injunction would not act to preserve the status quo. The status quo immediately preceding this litigation was that Sofiak and Abdallah's clients had the ability to exercise their freedom of choice to communicate and consult freely with the brokers of their choice. Any impediment to or limitation on the normal ability of clients to contact and consult with the financial advisors of their choosing patently disrupts the status quo, to the detriment of customers who are not before this Court.

18.     The interests of the public customers also weigh against granting injunctive relief. A brokerage customer's right to obtain financial advice from his or her chosen representative outweighs any interest of the brokerage firm. *Merrill Lynch, Pierce, Fenner & Smith v. Goodson*, 820 F. Supp. 1128, 1131 (S.D. Ind. 1993) ("This public interest outweighs [the firm's] interest in preventing [the broker] from obtaining this business.").

IT IS THEREFORE ORDERED, ADJUDGED and DECREED that:

1.  Plaintiff Merrill Lynch's motion for a preliminary injunction is DENIED.

2.  The parties are Ordered to proceed to arbitration before the National Association of Securities Dealers, Inc. (NASD).

SO ORDERED this _17_ day of August, 2006.

JEFFERY J. DYWAN
JUDGE, LAKE SUPERIOR COURT
CIVIL DIVISION ROOM NO. SEVEN

<u>Distribution</u>:
Gregory A. Neibarger
Carl A. Hayes
McTurnan & Turner
2400 Market Tower
10 West Market Street
Indianapolis, IN 46204

Timothy M. Curran
Boveri Murphy Rice & LaDue, LLP
400 Plaza Building
210 South Michigan Street
South Bend, IN 46601

David F. McComb
Rubin, Fortunato & Harbison, P.C.
MCS Building, Suite 202
10 South Leopard Road
Paoli, PA 19301

13

**EXHIBIT "D"**

## PROTOCOL FOR BROKER RECRUITING

The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms  If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding "  The signatories to this protocol agree to implement and adhere to it in good faith

When RRs move from one firm to another and both firms are signatories to this protocol, they may take only the following account information  client name, address, phone number, email address, and account title of the clients that they serviced while at the firm ("the Client Information") and are prohibited from taking any other documents or information  Resignations will be in writing delivered to local branch management and shall include a copy of the Client Information that the RR is taking with him or her   The RR list delivered to the branch also shall include the account numbers for the clients serviced by the RR  The local branch management will send the information to the firm's back office  In the event that the firm does not agree with the RR's list of clients, the RR will nonetheless be deemed in compliance with this protocol so long as the RR exercised good faith in assembling the list and substantially complied with the requirement that only Client Information related to clients he or she serviced while at the firm be taken with him or her

To ensure compliance with GLB and SEC Regulation SP, the new firm will limit the use of the Client Information to the solicitation by the RR of his or her former clients and will not permit the use of the Client Information by any other RR or for any other purpose   If a former client indicates to the new firm that he/she would like the prior firm to provide account number(s) and/or account information to the new firm, the former client will be asked to sign a standardized form authorizing the release of the account number(s) and/or account information to the new firm before any such account number(s) or account information are provided

The prior firm will forward to the new firm the client's account number(s) and/or most recent account statement(s) or information concerning the account's current positions within one business day, if possible, but, in any event, within two business days, of its receipt of the signed authorization  This information will be transmitted electronically or by fax, and the
requests will be processed by the central back office rather than the branch where the RR was employed  A client who wants to transfer his/her account need only sign an ACAT form

W/850873v1

RRs that comply with this protocol would be free to solicit customers that they serviced while at their former firms, but only after they have joined their new firms   A firm would continue to be free to enforce whatever contractual, statutory or common law restrictions exist on the solicitation of customers to move their accounts by a departing RR before he or she has left the firm

The RR's former firm is required to preserve the documents associated with each account as required by SEC regulations or firm record retention requirements

It shall not be a violation of this protocol for an RR, prior to his or her resignation, to provide another firm with information related to the RR's business, other than account statements, so long as that information does not reveal client identity

Accounts subject to a services agreement for stock benefits management services be-tween the  firm and the company sponsoring the stock benefit plan that the account holder participates in (such as with stock option programs) would still be subject to (a) the provisions of that agreement as well as to (b) the provisions of any account servicing agreement between the RR and the firm   Also, accounts subject to a participation agreement in connection with prospecting IRA rollover business would still be subject to the provisions of that agreement

If an RR is a member of a team or partnership, and where the entire team/partnership does not move together to another firm, the terms of the team/partnership agreement will govern for which clients the departing team members or partners may take Client Information and which clients the departing team members or partners can solicit   In no event, however, shall a team/partnership agreement be construed or enforced to preclude an RR from taking the Client Information for those clients whom he or she introduced to the team or partnership or from soliciting such clients

In the absence of a team or partnership written agreement on this point, the following terms shall govern where the entire team is not moving   (1) If the departing team member or partner has been a member of the team or partnership in a producing capacity for four years or more, the departing team member or partner may take the Client Information for all clients serviced by the team or partnership and may solicit those clients to move their accounts to the new firm without fear of litigation from the RR's former firm with respect to such information and solicitations, (2) If the departing team member or partner has been a member of the team or partnership in a producing capacity for less than four years, the departing team member or partner will be free from litigation from the RR's former firm with respect to client solicitations and the Client Information only for those clients that he or she introduced to the team or partnership

If accounts serviced by the departing RR were transferred to the departing RR pursuant to a retirement program that pays a retiring RR trailing commissions on the accounts in re-turn for certain assistance provided by the retiring RR prior to his or her retirement in transitioning the accounts to the departing RR, the departing RR s ability to take Client Information related to those accounts and the departing RR's right to solicit those ac-

counts shall be governed by the terms of the contract between the retiring RR, the departing RR, and the firm with which both were affiliated

A signatory to this protocol may withdraw from the protocol at any time and shall endeavor to provide 10 days' prior written notice of its withdrawal to all other signatories hereto   A signatory who has withdrawn from the protocol shall cease to be bound by the protocol and the protocol shall be of no further force or effect with respect to the signatory   The protocol will remain in full force and effect with respect to those signatories who have not withdrawn

Citigroup Global Markets Inc  ("Smith Barney")

By _____
Name   Kevin McManus
Title    Managing Director and Chief
         Administrative Officer, Private
         Client Branch System


Merrill Lynch, Pierce, Fenner & Smith Incorporated

By _____
Name   Phil Sieg
Title    Managing Director, Head of Strategic
         Leadership and Development


UBS Financial Services Inc.

By _____
Name   Barry Buchsbaum
Title    Director of Strategic Development
         Executive Vice President

- 3 -

**EXHIBIT "E"**

**Morgan Stanley**

**Financial Advisor Transition Policy & Acknowledgment**

Welcome to Morgan Stanley Smith Barney LLC ("Morgan Stanley") and congratulations on your decision to join our culture of excellence.  As a new member of our team of world-class Financial Advisors, you have committed to providing your clients with the highest quality of products and the highest standards of service.  This policy sets forth the Firm's expectations regarding the transition of Financial Advisors to Morgan Stanley.  In keeping with the Firm's Code of Conduct and related policies, it is the Firm's expectation that you will conduct yourself throughout your transition and afterwards in a professional manner acting at all times in the best interests of our clients and with due regard for any obligations or commitments you may have to any prior employer.

<u>**Account Information**</u>

In connection with your transition to Morgan Stanley, the Firm expects that you will comply with applicable law and regulations, conduct yourself consistent with Industry standards, and with any instructions provided to you by Morgan Stanley and/or attorneys retained by Morgan Stanley on your behalf.

Consistent with the foregoing policy and any obligations you owe your former employer, if your prior employer is not a member of the Broker Recruiting Protocol, the Firm expects that you will retain at most only limited information for those clients you serviced at your prior employer that could be used to contact clients about your move to Morgan Stanley.  If your prior employer is a member of the Broker Recruiting Protocol, the Firm expects that you will retain <u>only</u> the following account information for those clients you are permitted to solicit under the Broker Recruiting Protocol:

- client name
- address
- phone number
- email address
- account title

Under no circumstances should you provide to Morgan Stanley any client-identifying information prior to you joining Morgan Stanley or should you retain or bring any of the following client-related information from your prior employer to Morgan Stanley:

- Account Statements;
- Account Numbers;
- Social Security Numbers;
- Client Files;
- Copies of notes;
- Computer programs developed by or for any other employer whether on disc, CDROM, or other format; or
- Electronically stored client-related data or documents that exceed what is permitted and consistent with applicable law, regulations, and Industry standards.

If you have any questions about your transition or any of the foregoing, please consult with management and/or your legal advisor.   We are excited about you joining the Firm and want your transition here to be as seamless as possible, which means minimizing the probability of any disputes regarding your transition.

March 3, 2016

**Morgan Stanley**

**Financial Advisor Transition Policy & Acknowledgment**

## ACKNOWLEDGMENT

I acknowledge and agree that I have received and reviewed a copy of Morgan Stanley's Financial Advisor Transition Policy and I confirm that I have complied and will continue to comply with its requirements. I understand that Morgan Stanley is relying on the accuracy of my representations in making an offer of employment to me, and that such offer any my employment thereafter is contingent on my compliance with this Policy.

Date: _____

Financial Advisor: _____

March 3, 2016

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

| | |
|---|---|
| In the Matter of the Arbitration Between )<br><br>**CHARLES SCHWAB & CO., INC.** )<br>      )<br>          Claimant, )<br>      )<br>          -and- )<br>      )<br>**TODD THRASHER & MORGAN** )<br>**STANLEY SMITH BARNEY LLC,** )<br>      )<br>          Respondents. ) | **FINRA NO. 11-04088** |

## RESPONDENT MORGAN STANLEY SMITH BARNEY LLC'S STATEMENT OF ANSWER

Respondent Morgan Stanley Smith Barney LLC ("Morgan Stanley") submits this Answer to Claimant Charles Schwab & Co., Inc.'s ("Schwab") Statement of Claim.

## INTRODUCTION

Schwab has made various claims against Morgan Stanley resulting from the decision of one Schwab financial advisor, Todd Thrasher ("Thrasher"), to resign from Schwab and join Morgan Stanley in St. Louis, Missouri. None of Schwab's allegations carry substantive merit. Neither Morgan Stanley nor Thrasher misappropriated Schwab's confidential or trade secret information. Morgan Stanley did not tortiously interfere in any way with Schwab's contractual business relationships nor did it engage in unfair competition. Morgan Stanley's decision to hire Thrasher was not done with improper or wrongful means. The fact that a financial advisor chose to leave his firm and join a competitor does not amount to unfair competition, nor does it give rise to any of the other claims brought against Morgan Stanley in this case.

**RECEIVED**

JAN 2 4 2012

**FISHER & PHILLIPS LLP**

1

## FACTUAL BACKGROUND

Morgan Stanley is a financial services firm with branches all over the world, including St. Louis, Missouri.  Schwab is an online discount brokerage firm with a presence throughout the country.

Thrasher worked out of Schwab's Clayton, Missouri office as a Private Client Consultant, a position that he held since 2002.  In the past few years, as established at the Rule 13804 hearing, Schwab made numerous changes to its business structure and to Thrasher's position that concerned Thrasher.  Despite Thrasher's success in building his book of business, Schwab downgraded Thrasher's job title.  Schwab also changed the way in which Thrasher was compensated, resulting in decreased compensation to Thrasher.  Upon information and belief, Schwab also ceased providing many of the perks that Schwab had previously provided to Thrasher, including trips for job-related symposia.  All of these actions resulted in decreased compensation to Thrasher and led Thrasher to the decision to leave Schwab.  Thrasher worked for Schwab until October 14, 2011, when he resigned and became employed by Morgan Stanley.

Thrasher acted consistently with his obligations not to remove any trade secret customer information or violate the non-solicitation provisions of his Schwab employment contract. Thrasher did not solicit any customers prior to leaving Schwab.  After leaving, he did not send any solicitation mailings or newsletters and did not place any advertisements.  Thrasher called many of the clients that he serviced at Schwab to inform them of his move.  He did not solicit those clients' business but just informed them of his move and gave his contact information.  If a client told him that he/she didn't intend to transfer to Morgan Stanley, he terminated the call and did not follow up.

Thrasher did not inform any clients or colleagues about his decision to leave until he announced his resignation to Schwab. He did not take any client files or other Schwab documents with him when he resigned. As the evidence showed at the Rule 13804 hearing, the only document that Thrasher took with him when he resigned was a Christmas card list that he had created over several years that contained a running list of clients' names, addresses and telephone numbers. After his resignation, he also created a list of clients that he had serviced while at Schwab from memory.

Thrasher did provide to Morgan Stanley prior to his resignation a document that contained some limited customer account information, but it was not used by Thrasher or Morgan Stanley and Thrasher only provided the information in an effort to show his potential new employer what types of accounts he serviced and managed. Indeed, Thrasher had forgotten that he had given Morgan Stanley the document until he was presented with it at his deposition. The proof demonstrated at the Rule 13804 hearing that Morgan Stanley did not use the document and that it had been returned to Schwab prior to the hearing. Schwab will not be damaged by Respondents' temporary possession of the document.

Morgan Stanley's hiring of Thrasher was not done with improper or wrongful means. Morgan Stanley did not induce Thrasher to leave Schwab by offering substantial monetary incentives. Morgan Stanley's offer to Thrasher was a normal compensation package. Instead, Thrasher's primary motivation for leaving Schwab was his displeasure and frustration with Schwab. Morgan Stanley did not tortiously interfere in any way with Schwab's contractual business relationships nor did it engage in unfair competition.

## RESPONSE TO CLAIMS AGAINST MORGAN STANLEY

1. **Morgan Stanley did not misappropriate or misuse confidential or trade secret information.**

Morgan Stanley does not have in its possession any Schwab trade secret information. Thrasher did not misappropriate any trade secrets from Schwab and thus could not have used any such trade secrets after he became employed at Morgan Stanley.

Schwab's misappropriation claim is based on a list of customer names, addresses and/or phone numbers that Thrasher took with him when he left Schwab. Thrasher did not take any additional customer information or confidential Schwab information. The names, addresses and telephone numbers of customers serviced by Thrasher are not protectable trade secret information.

Courts in other jurisdictions have determined that within the securities industry, employers do not have a protectable interest in customer lists such as those at issue in this case. *See UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436 (W.D.N.C. 2002) (customer contact information in the securities industry found not to be a trade secret); *Novacare Orthotics & Prosthetics v. Speelman,* 528 S.E.2d 918, 922 (2000) (customer list not trade secret because information used to contact customers was "easily accessible to defendant through a local phone book"). Indeed, it is accepted industry practice for brokers to take with them copies of client identifying information so that those clients who choose to follow the broker can be serviced at the new firm. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Callahan*, 265 F. Supp. 2d 440 (D. Vt. 2003) (denying injunctive relief, in part, because standard industry practice is for brokers to solicit former clients); *Morgan Stanley DW, Inc. v. Frisby*, 163 F. Supp. 2d 1371, 1378 (N.D. Ga. 2001) (holding that client information is not proprietary and is not sufficiently "secret" for trade secret protection); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E.F. Hutton & Co., Inc.,*

403 F. Supp. 336, 341 (E.D. Mich. 1975) (stating that it is established practice for brokers to retain customer lists when they depart and the removal of customer lists and solicitation of customers is a standard industry practice).

To the extent Schwab's claim is based on a document Thrasher provided to Morgan Stanley that contained account information, the document was not used by Respondents.  During discussions with Morgan Stanley regarding employment opportunities, Thrasher provided Morgan Stanley with a document that contained information about his practices at Schwab and limited customer account information.  Morgan Stanley did not ask Thrasher for this information, but instead sought general information as to his gross revenue production and types of accounts.  Thrasher had forgotten about the document and Morgan Stanley returned the document voluntarily.  Neither Thrasher nor Morgan Stanley used the information contained in the document.  Upon discovering the document, Morgan Stanley immediately returned it to Schwab and neither Morgan Stanley nor Thrasher has copies of the document.  Accordingly, Schwab has not and cannot be damaged by Respondents' temporary possession of the document.

2. **Morgan Stanley has not interfered with Schwab's contractual and business relationships and did not aid and abet any alleged breach of Thrasher's agreement with Schwab.**

Morgan Stanley is not restricted from competing with Claimant.  Morgan Stanley did not interfere in Schwab's relationships actual or prospective business relationships with customers.  Morgan Stanley has in no way induced Thrasher to commit any breach of contract, misappropriate trade secret information or otherwise breach any other duties to Claimant.

Under Missouri law, a claim for tortious interference with a contract or business expectancy requires proof of each of the following: "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference

by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and, (5) damages resulting from defendant's conduct." *Cmty. Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n*, 796 S.W.2d 369, 372-73 (Mo. 1990).

"The mere fact that defendant's conduct may have had a negative effect on plaintiffs' business expectancies does not, *a fortiori,* establish an absence of justification." *Cmty. Title Co.,* 796 S.W.2d at 373. Under Missouri law, a defendant is justified in interfering with another's business expectancy for the purpose of protecting his own economic interest, so long as he does not employ improper means. *Baldwin Properties, Inc. v. Sharp*, 949 S.W.2d 952, 956-57 (Mo. Ct. App. 1997); *Cmty. Title Co.,* 796 S.W.2d at 372-373. Improper means are "those means which are independently wrongful, notwithstanding injury caused by the interference." *Cmty. Title Co.,* 796 S.W.2d at 373. Improper means include, "threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Baldwin Properties, Inc.*, 949 S.W.2d at 956-57.

Morgan Stanley's actions and intentions with regard to the hiring of Thrasher were not improper, malicious or done with ill will and thus do not constitute intentional interference or inducement of any alleged breach. *Tri-Cont'l Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 215 (Mo. Ct. App. 1976) ("When asserting a cause of action for intentional inducement of a breach of contract, the plaintiff must show that the defendant maliciously, that is, with knowledge of the contract and without justifiable cause, induced the breach."). Contrary to Schwab's allegations, Morgan Stanley did not provide Thrasher with substantial financial inducements or other incentives other than what Morgan Stanley offered to all of its lateral hires in order to encourage Thrasher to join Morgan Stanley. Morgan Stanley's conduct was not unlawful or improper in any way. Morgan Stanley did nothing more than hire Thrasher, who had decided to leave

Schwab of his own accord.  Thrasher would not have remained at Schwab but-for Morgan Stanley's hiring him.  Thrasher had decided to leave Schwab and, upon information and belief, would have left Schwab even if Morgan Stanley had not hired him.

### 3.   **Schwab's agreements are unreasonable and therefore are not all enforceable.**

During his employment with Schwab, Thrasher signed multiple agreements that contained different types of restrictions.  Each of the agreements is attached to Schwab's Statement of Claim.  The agreements are not all alike and show how Schwab's restrictions have evolved.[1]  It is not clear from Schwab's Statement of Claim which of the restrictions from the various agreements Schwab is seeking to enforce even though Schwab unreasonably seeks to prevent Thrasher from even contacting customers he serviced at Schwab.  However, Schwab reveals its genuine understanding and concedes the 2010 agreement is the operative agreement through its counsel's letter of October 17, 2011.  In that letter, Schwab attaches the 2010 Agreement, proclaims Thrasher's post-employment obligations and requests compliance.  The obligations consist of the restrictions only from the 2010 agreement which do not prevent Thrasher from contacting customers.  A copy of the October 17, 2010 letter is attached as Exhibit A.

The 2010 Agreement is the least restrictive of the agreements, dropping the earlier "no contact" provisions, and only contains an eighteen month non-solicitation restriction against

---

[1] The 2002 Agreement contained a twenty-four month non-solicitation restriction and a very broad non-compete provision that required Thrasher not to "sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or prospective customers of Schwab that I serviced (directly or indirectly)...or whose identity I learned, during my employment with Schwab."

The 2004 and 2006 agreements have an eighteen month restriction against solicitation and a more limited non-compete that Thrasher not "sell or offer to sell any security, retirement, insurance or annuity product or related service to any customer or Prospective Customer of Schwab that I solicited or attempted to solicit in breach of my obligations hereunder."  The agreements also contain a restriction against "initiat[ing] any contact for any purpose with any of the Specified Accounts (including notifying them of my new or subsequent place(s) of employment)" for twelve months.  The 2007 agreement contains similar restrictions, but does not have a non-compete restriction.

"directly or indirectly solicit[ing] or induc[ing]...any existing or prospective Schwab clients [Thrasher] serviced or about whom [Thrasher] gained Confidential Information in an attempt to divert, transfer or otherwise take away business or prospective business from Schwab." The 2010 Agreement contains no restriction upon Thrasher's rights to notify the customers he serviced at Schwab of his change of employment or provide them with his personal contact information.

Many of the restrictions contained in the Schwab agreements are unenforceable under Missouri law because they are overly broad and unreasonable, particularly the restriction in prior versions of the agreements against contacting clients for any purpose and the restriction from selling products to customers, regardless of whether Thrasher solicited them when he was employed by Schwab. In Missouri, agreements that restrain trade, such as covenants not to compete and non-solicitations, are disfavored. As such, triers of fact are to construe such restrictions narrowly and in favor of the employee, and, above all, be reasonable. *Orchard Container Corp. v. Orchard*, 601 S.W.2d 299, 303 (Mo. App. 1980) ("An employer may only seek to protect certain narrowly defined and well-recognized interests, namely its trade secrets and its stock in customers.").

For Schwab to enforce the non-solicitation provision in the Agreement, Schwab has the burden of demonstrating "'both the necessity to protect the claimant's legitimate interest and that the agreement is reasonable as to time and space.'" *Payroll Advance, Inc. v. Yates*, 270 S.W.3d 428, 434 (Mo. Ct. App. 2008) (quoting *Healthcare Services of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 609-10 (Mo. 2006)). Schwab will not be able to establish a protectable interest for which the non-contact, non-solicitation and non-compete restrictions are necessary. The restrictions go well beyond protecting Schwab against unfair competition and are far more

restrictive than necessary to protect any of Schwab's legitimate interests.  The fact that Schwab has changed the nature and extent of the restrictions – and even eliminated certain restrictions – over the years is further evidence that the restrictions are not reasonable.

Thrasher did not breach his agreement with Schwab.  Thrasher's 2010 Agreement with Schwab, which is the controlling agreement, did not contain any restriction on Thrasher's right to announce to the customers he serviced at Schwab of his change of employment or provide them with his personal contact information.  Thrasher's announcing to customers that he had moved to Morgan Stanley is not a violation of his contract.  Moreover, courts have held that a mere announcement or informational contact does not constitute solicitation.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618, 620 (N.D. Ill. 2000) ("It would be unlawful, as well as unreasonable, for Merrill Lynch to seek to prohibit [the broker] from giving his former customers an announcement of his intent to move to other employment and notice where he could be reached should the customers wish to contact him...an informational announcement regarding [the broker's] new employment was essential."); *Morgan Stanley DW, Inc. v. Clayson*, 2005 WL 1009651, *6 (Mass. Super. Mar. 14, 2005) ("'The customers have a paramount right to be advised of the move by their broker and, that this right includes receiving personal contact from their broker. The customers have the right to be informed that they decide whether to remain with Merrill Lynch or to transfer their account.'") (quoting *Merrill Lynch Pierce Fenner & Smith, Inc. v. Stark*, No. 02-05187 (NASD Sept. 19, 2002)); *Wells v. Merrill Lynch, Pierce, Fenner & Smith,* 919 F. Supp. 1047, 1053 (E.D.K.Y. 1994) ("[A] mere informational contact does not constitute solicitation.").

Once Morgan Stanley employed Thrasher, all contact by Thrasher with customers complied with his former Schwab contract.  Thrasher announced to several clients his departure

from Schwab and employment with Morgan Stanley.  Those announcements are not solicitations as defined by the Agreement.  He did not solicit, entice, request or urge any customer to transfer his or her account to Morgan Stanley.  Thrasher has not solicited any of Schwab's clients in violation of any alleged agreement and did not misappropriate any confidential or trade secret information.  Without a breach of contract, Schwab's claim that Morgan Stanley aided and abetted a breach of contract fails as a matter of law.

To the extent that Schwab's claims are based on the alleged misappropriation of confidential and trade secret information, they are preempted by the Missouri Uniform Trade Secrets Act.  *See* Mo. Ann. Stat. § 417.463 (providing that Missouri's Uniform Trade Secrets Act "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret"); *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 2002 WL 32727076 (E.D. Mo. Feb. 25, 2002) ("[C]ivil claim that are derivative of a claim of misappropriation of trade secrets are preempted. A claim that is based on facts related to the misappropriation claim is deemed derivative and, thus, preempted.").

### 4.    <u>Morgan Stanley did not engage in unfair competition.</u>

"The essence of law for unfair competition is fair play."  *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 758 F. Supp. 512, 527 (E.D. Mo. 1991).  Under Missouri law, a defendant may be liable for unfair competition if its behavior "violate[s] society's notions of fair play and fundamental fairness." *Sales Res., Inc. v. Alliance Foods, Inc.*, 2009 WL 2382365 (E.D. Mo. July 30, 2009).  Means that are otherwise tortious with respect to the injured party may constitute an unfair method of competition, including unlawful threats directed at customers of the competitor or failure to disclose to prospective consumers particular information that is critical to an intelligent purchasing decision. *Id.*

As discussed above, Morgan Stanley's hiring of Thrasher was proper and fair and Morgan Stanley's actions with respect to customers serviced by Thrasher while he was employed by Schwab also comport with the notions of fair play.  Morgan Stanley never acted tortiously or with the intent to injure Schwab.  The conduct of Morgan Stanley was not unlawful or improper in any way.  Thus, Schwab's unfair competition claim fails as a matter of law.

## **ANSWERS TO SPECIFIC FACTUAL ALLEGATIONS**

To the allegations in the enumerated paragraphs of the Statement of Claim, Morgan Stanley responds as follows:

1.      Upon information and belief, Morgan Stanley admits the allegations contained in paragraph 1 of the Statement of Claim.

2-4.    Morgan Stanley admits the allegations contained in paragraphs 2 through 4 of the Statement of Claim.

5.      Morgan Stanley admits that the Form U-4 speaks for itself.  Any allegations inconsistent with the Form U-4 are denied.  Morgan Stanley is without sufficient information to admit or deny the remaining allegations contained in paragraph 5 of the Statement of Claim.

6-7.    Morgan Stanley admits the allegations contained in paragraphs 6 and 7 of the Statement of Claim.

8-14.   Morgan Stanley is without sufficient information to admit or deny the allegations contained in paragraphs 8 through 14 of the Statement of Claim.

15-16. Morgan Stanley admits that Exhibit A to the Statement of Claim speaks for itself.  Any allegation inconsistent with Exhibit A is denied.  Morgan Stanley is without sufficient information to admit or deny the remaining allegations contained in paragraphs 15 and 16 of the Statement of Claim.

17.     Morgan Stanley admits that Exhibits B through F to the Statement of Claim speak for themselves.   Any allegation inconsistent with Exhibits B through F is denied.   Morgan Stanley is without sufficient information to admit or deny the remaining allegations contained in paragraph 17 of the Statement of Claim.

18.     Morgan Stanley admits that Exhibit B to the Statement of Claim speaks for itself. Any allegation inconsistent with Exhibit B is denied.   Morgan Stanley is without sufficient information to admit or deny the remaining allegations contained in paragraph 18 of the Statement of Claim.

19.     Morgan Stanley admits that Exhibit F to the Statement of Claim speaks for itself. Any allegation inconsistent with Exhibit F is denied.   Morgan Stanley is without sufficient information to admit or deny the remaining allegations contained in paragraph 19 of the Statement of Claim.

20.     Morgan Stanley denies the allegations contained in paragraph 20 of the Statement of Claim.

21.     Morgan Stanley admits that Exhibit G to the Statement of Claim speaks for itself. Any allegation inconsistent with Exhibit G is denied.   Morgan Stanley is without sufficient information to admit or deny the remaining allegations contained in paragraph 21 of the Statement of Claim.

22.     The allegations in this paragraph set forth conclusions of law for which no answer is required.   To the extent an answer is required, Morgan Stanley denies the allegations contained in paragraph 22 of the Statement of Claim.

23.     The allegations in this paragraph set forth conclusions of law for which no answer is required.   To the extent an answer is required, Morgan Stanley is without sufficient

12

information to admit or deny the allegations contained in paragraph 23 of the Statement of Claim.

24.     Morgan Stanley admits the allegations contained in paragraph 24 of the Statement of Claim.

25.     Morgan Stanley admits that some customers formerly serviced by Thrasher at Schwab have transferred their accounts to Morgan Stanley.  Morgan Stanley is without sufficient information to admit or deny the allegation that numerous Schwab clients have reported to Schwab.  Morgan Stanley denies the remaining allegations contained in paragraph 25 of the Statement of Claim.

26.     Morgan Stanley admits that is providing legal counsel to Thrasher and it offered a standard compensation package to Thrasher.  With respect to legal indemnity, Morgan Stanley asserts that this allegation calls for a response that is speculative and that calls for a legal conclusion such that Morgan Stanley is without sufficient information to admit or deny the allegation.  Morgan Stanley denies the remaining allegations contained in paragraph 26 of the Statement of Claim.

27-29. Morgan Stanley denies the allegations contained in paragraphs 27 through 29 of the Statement of Claim.

30.     Morgan Stanley is without sufficient information to admit or deny the allegations contained in paragraph 30 of the Statement of Claim.

31.     Morgan Stanley admits that Exhibit H to the Statement of Claim speaks for itself. Any allegation inconsistent with Exhibit H is denied.  Morgan Stanley is without sufficient information to admit or deny the remaining allegations contained in paragraph 31 of the Statement of Claim.

32.     The allegations in this paragraph set forth conclusions of law for which no answer is required.  To the extent an answer is required, Morgan Stanley denies the allegations contained in paragraph 32 of the Statement of Claim.

33.     Morgan Stanley is without sufficient information to admit or deny the allegations in the second sentence of paragraph 33 of the Statement of Claim.  The remaining allegations in this paragraph set forth conclusions of law for which no answer is required.  To the extent an answer is required, Morgan Stanley denies the remaining allegations contained in paragraph 33 of the Statement of Claim.

34.     The allegations in this paragraph set forth conclusions of law for which no answer is required.  To the extent an answer is required, Morgan Stanley denies the allegations contained in paragraph 34 of the Statement of Claim.

35-39. Morgan Stanley denies the allegations contained in paragraphs 35 through 39 of the Statement of Claim.


Morgan Stanley denies any allegations in the Conclusion and Request for Relief and further denies Schwab is entitled to an injunction or the damages and other relief it seeks.


## FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED & AFFIRMATIVE DEFENSES

Schwab fails to state any claim upon which relief may be granted.

Schwab is estopped on the grounds of estoppel and waiver from asserting that Morgan Stanley's actions amount to raiding or other tortious conduct.

WHEREFORE, Morgan Stanley respectfully requests that the Panel enter an award:

i.      Dismissing Morgan Stanley from this arbitration;

ii.     Granting Morgan Stanley its attorneys' fees for defending this arbitration;

iii.    Assessing costs against Schwab; and

iv.     Granting Morgan Stanley any other relief the Panel deems just and equitable under the circumstances.

Respectfully submitted,

Salvador M. Hernandez
Cassie N. Madden
Riley Warnock & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
(615)320-3700

Counsel for Morgan Stanley Smith Barney LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via E-mail and U.S. Mail to:

J. Randall Coffey
Fisher & Phillips LLP
The Stillwell Building, Suite 400
104 West Ninth Street
Kansas City, MO 64105-1718

Michael R. Greco
Christopher Stief
James P. McLaughlin
Fisher & Phillips LLP
Radnor Financial Center
201 King of Prussia Rd., Suite 650
Radnor, Pennsylvania 19087

S. Francis Baldwin
Attorney At Law
9909 Clayton Rd., Suite 226
St. Louis, MO  63124

on this 17th day of January, 2012

# FISHER & PHILLIPS LLP

### ATTORNEYS AT LAW

www.laborlawyers.com

**Kansas City**
104 West 9th Street
Suite 400
Kansas City, MO 64105

(816) 842-8770 Tel
(816) 842-8767 Fax

Writer's Direct Dial:
(816) 460-1235

Writer's E-mail:
jholland@laborlawyers.com

October 17, 2011

<u>Via Federal Express Delivery</u>

Todd Thrasher
1023 W Frisco Ave
Kirkwood, MO 63122

      *Re:   Post Employment Obligations to Charles Schwab & Co., Inc.*

Dear Mr. Thrasher:

     This firm has been retained to represent Charles Schwab & Co., Inc. ("Schwab") in all matters concerning your post-employment obligations to Schwab. Enclosed please find a copy of the most recent <u>Confidentiality, Nonsolicitation, and Intellectual Property Ownership Agreement</u> (the "Agreement") that you executed as a condition of your employment with Schwab.

     This letter outlines the post-employment legal obligations you owe to Schwab. Your Agreement specifically provides, among other things, that you will protect Schwab's confidential information, including its customer information, and will not use or disclose this information at any time. Specifically, sections 1 and 2 of the Agreement provide:

          **1.    Protection of Schwab's Confidential Information and Intellectual Property.** . . . I agree not to use or disclose any Confidential Information and/or Intellectual Property during or after my employment with Schwab . . .

          **2.    What Is Schwab Confidential Information and Intellectual Property?** "Confidential Information" is all information learned during my employment that is not generally known to the public at the time it is made known to me. It includes, but is not limited to: "Trade Secrets" and "Developments," as defined below; names, addresses, phone numbers, email addresses, account numbers or financial information pertaining to Schwab clients; . . . information sufficient to identify clients, vendors, or personnel; client, vendor or personnel lists, contact, account and related information . . .



     Further, pursuant to your Agreement, you agreed not to solicit Schwab's customers for a



October 17, 2011
Page 2

period of eighteen months following the termination of your employment with Schwab. Specifically, in paragraph 3 of the Agreement, you agreed:

> 3.    **Agreement Not to Solicit.**  While I work for Schwab and for 18 months after my employment ends, I will not directly or indirectly solicit or induce: (a) any Schwab clients I serviced or about whom I gained Confidential Information (other than those listed in Exhibit A) in an attempt to divert, transfer, or otherwise take away business from Schwab; and/or (b) any Schwab employee or contingent worker to leave his or her employment or engagement with Schwab.

Schwab demands compliance with your post-employment obligations and the terms of your Agreement, and will monitor this situation to ensure your compliance.  Please be aware that Schwab will take legal action if necessary to enforce and/or remedy any violations of your post-employment obligations and/or the terms of your Agreement.

Please bring a copy of this letter and the enclosed Agreement to the attention of your manager and the Legal or Compliance group at any new employer so that they may assist in ensuring compliance with your duties.  If you have any questions about this matter, please do not hesitate to contact me.  Thank you.

Sincerely,

James R. Holland, II
For FISHER & PHILLIPS LLP

Enclosure

CHARLES SCHWAB CONFIDENTIALITY, NONSOLICITATION, AND INTELLECTUAL PROPERTY
OWNERSHIP AGREEMENT 2010

**CONFIRMATION PAGE**

Confirmation of Agreement to and Signature on CONFIDENTIALITY, NONSOLICITATION, AND INTELLECTUAL PROPERTY OWNERSHIP AGREEMENT 2010.

This is your Confirmation of your electronic agreement to the CHARLES SCHWAB CONFIDENTIALITY, NONSOLICITATION, AND INTELLECTUAL PROPERTY OWNERSHIP AGREEMENT 2010. You may print this copy and record of our agreement and retain it for your records.

To PRINT this page, simply click the PRINT BUTTON on your browser.

Employee: Todd Thrasher
Employee ID: 03957
Employee Logon: us\todd.thrasher
Employee Email: Todd.Thrasher@Schwab.com
Employee Telephone: +1(314)726-3610
Employee Manager: Tad Fryer

Date of Electronic Signature: 02/19/2010 10:51:40 AM EST

**I AM ENTERING INTO THIS AGREEMENT IN CONSIDERATION FOR** my initial or continued at-will employment with Charles Schwab & Co., Inc., its parent company and/or its subsidiaries, affiliates, joint venturers, and successors (collectively, "Schwab"), and the compensation and other benefits I receive from Schwab, including my participation in bonus and incentive compensation plans for which I am eligible. Acknowledging the receipt and adequacy of this consideration, and intending to be legally bound, I agree as follows:

   a.  that I will maintain the confidentiality of all Confidential Information and confidential Intellectual Property, as defined below, that I develop or obtain while I work at Schwab;

   b.  that Schwab owns all Confidential Information and Intellectual Property, and that I will not assert any claim to the Confidential Information and/or Intellectual Property; and

   c.  that I will not solicit or encourage Schwab's employees or Schwab's clients to leave Schwab.

The scope of these obligations, and some of the possible consequences for breaching them, are described in more detail below.

1.  **Protection of Schwab's Confidential Information and Intellectual Property.** While working at Schwab, I will develop and/or have access to Schwab's Confidential Information and/or Intellectual Property, as defined in Paragraph 2. I acknowledge that Confidential Information and Intellectual Property is the exclusive property of Schwab, its business partners, licensors, and/or clients, and I agree not to assert any claim to it. Except as permitted in Paragraph 7, I agree not to use or disclose any Confidential Information and/or Intellectual Property during or after my employment with Schwab. I understand that Schwab's policy prohibits departing employees from taking client lists and account information.

2.  **What is Schwab Confidential Information and Intellectual Property?** "Confidential Information" is all information learned during my employment that is not generally known to the public at the time it is made known to me. It includes, but is not limited to: "Trade Secrets" and "Developments," as defined below; names, addresses, phone numbers, email addresses, account numbers or financial information pertaining to Schwab clients; proprietary software designs and hardware configurations; proprietary technology; business methods or strategies; new product and service ideas; marketing, financial, research and sales data; information sufficient to identify clients, vendors, or personnel; client, vendor or personnel lists, contact, account and related information; and all information Schwab treats or is obligated to treat as confidential, privileged, or for internal use only, whether or not owned by Schwab. "Trade Secrets" is any information that (i) has economic value from not being

generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its use; and (ii) Schwab takes reasonable steps to protect as secret. "Intellectual Property" is Schwab's copyrighted materials, trademarks, service marks, logos, patents, Trade Secrets, and other intellectual property and proprietary rights.

3. **Agreement Not to Solicit.** While I work for Schwab and for 18 months after my employment ends, I will not directly or indirectly solicit or induce: (a) any Schwab clients I serviced or about whom I gained Confidential Information (other than those listed in Exhibit A) in an attempt to divert, transfer, or otherwise take away business from Schwab; and/or (b) any Schwab employee or contingent worker to leave his or her employment or engagement with Schwab.

4. **Removal and Return of Schwab Property.** I will not remove any Schwab property, including any Confidential Information and/or Intellectual Property, in original or copied form, in either electronic or hardcopy form, except as required for me to carry out my job duties while employed by Schwab. Upon termination of my employment with Schwab for any reason, my acceptance of other employment, or at Schwab's request, I will immediately return to Schwab all Schwab property and documents, including but not limited to Confidential Information and/or Intellectual Property; any Schwab-issued credit cards, security badges, keys and Secure ID tokens; and all Schwab-issued electronic and telephonic equipment including but not limited to computers, mobile phones, personal data assistants, CD-ROMs, DVDs, floppy disks, Zip drives, USB storage devices, flash drives, memory cards, or other electronic devices ("Electronic Devices").

5. **Obligation to Protect Confidential Information and Intellectual Property.** I will promptly notify Schwab if I become aware of or suspect any unauthorized use or disclosure of Confidential Information and/or Intellectual Property by me or anyone else, whether intentional or accidental.

6. **Schwab's Ownership of Intellectual Property "Developments."**

   a. **Disclosure of Developments While Employed by Schwab.** I will promptly disclose in confidence to Schwab all inventions, improvements, designs, original works of authorship, and processes, including but not limited to all computer software programs and databases, whether or not protected or capable of protection under intellectual property or other laws, as well as all works based upon, derived from, reduced from, collecting, containing or making use of any of the foregoing or of any other Confidential Information or Intellectual Property of Schwab (collectively, "Developments") that I create, make, conceive, implement, or first reduce to practice, either alone or with others, while I am employed by Schwab, and: (a) result from any work I perform for Schwab, whether or not in the normal course of my employment or during normal business hours; (b) reasonably relate to the actual or anticipated business, research or development of Schwab; or (c) are developed with the use of Schwab resources, facilities, Confidential Information and/or Intellectual Property.

   b. **Help in Confirming Ownership.** I must promptly disclose Developments to Schwab whether or not the Developments are patentable, copyrightable, or protectable as Trade Secrets. I agree all Developments will be the exclusive property of Schwab, and I irrevocably assign to Schwab all rights, title, and interest I may have or acquire in and to the Developments and the right to secure registrations, renewals, reissues, and extensions in the Developments. I will sign any documents and do all things necessary, whether during my employment or after, to assist Schwab to register, perfect, maintain and enforce Schwab's rights in any Developments, without any additional compensation. If I fail or refuse for any reason to sign any document Schwab requires to perfect its ownership of the Developments, I appoint Schwab as my attorney-in-fact (this appointment to be irrevocable and to be a power coupled with an interest) to act on my behalf and to execute all such documents.

   c. **State Laws Relating to Ownership of Developments.** I understand if I am or become a California resident while employed by Schwab, then this Paragraph 6 will not apply to any Developments which fully qualify under Section 2870 of the California Labor Code, attached as Exhibit B to this Agreement. To the extent other similar laws may apply to residents of other states, the terms of Paragraph 6 shall be limited solely to the extent provided by the applicable laws of such states.

d. **Pre-Existing Intellectual Property.** To the extent I have any pre-existing patent, trademark, or copyright registrations, I have listed them in <u>Exhibit C</u>. I understand Schwab does not want to use any other person's intellectual property unlawfully. I agree to indemnify and hold Schwab harmless against any liability, and pay any loss or expense Schwab incurs, arising out of any claim that I misappropriated or infringed proprietary rights of a former employer or any other third party.

7. **Permissible Disclosure of Confidential Information and/or Intellectual Property.** I can only use or disclose Confidential Information and/or Intellectual Property to the extent: (a) necessary to perform my job duties at Schwab; (b) I receive advance written permission from an authorized executive officer of Schwab; (c) I am legally compelled by subpoena or other legal process to disclose the Confidential Information and/or Intellectual Property, subject to the procedures in Paragraph 9; or (d) disclosure is sought by a government entity, regulatory agency, or self regulatory organization, subject to the procedures in Paragraph 9.

8. **Questions About Confidential Information and/or Intellectual Property.** If I am unsure whether information is Confidential Information and/or Intellectual Property, I will treat it as Confidential Information and/or Intellectual Property unless I receive advance written permission from an authorized senior or executive officer of Schwab.

9. **Subpoenas and Other Legal Requests for Disclosure.** I will give Schwab prompt notice in writing before disclosing any Confidential Information and/or Intellectual Property under Paragraph 7 subsections (c) and (d). If Schwab does not obtain an order preventing the disclosure, I agree to disclose only that Confidential Information and/or Intellectual Property that I am legally compelled to disclose and to exercise reasonable efforts to ensure that the Confidential Information and/or Intellectual Property will be treated confidentially.

10. **Discovery and Injunctive Relief.** In the event I violate, or Schwab reasonably believes I am about to violate, this Agreement, I agree Schwab is entitled to injunctive relief to prevent the violation(s) and/or preserve the *status quo*. I agree that in any proceeding alleging breach of this Agreement, each party shall have the right to engage in deposition and document discovery, and Schwab shall have the right to conduct forensic examination (s) of Electronic Devices in my possession or control, if Schwab reasonably believes such devices contain Confidential Information and/or Intellectual Property. I further agree that in connection with any application for injunctive relief, discovery shall be conducted on an expedited basis. If any dispute under this Agreement is arbitrable, then I understand my agreement to engage in discovery as outlined in this paragraph is an essential term of my arbitration agreement with Schwab, and these provisions are intended to supplement and modify any applicable arbitration rules.

11. **Liquidated Damages.** If I solicit clients or employees in violation of Paragraph 3, and/or use or disclose Confidential Information relating to clients and/or their accounts in violation of Paragraph 1, I understand Schwab will suffer damages that may be difficult to quantify at the time of the violation, including, but not limited to: costs associated with investigating, monitoring, or remedying the misuse of Confidential Information; costs associated with maintaining, restoring or repairing Schwab's relationship with clients; revenue lost from client assets transferred from Schwab or diverted from Schwab's retail business to an investment advisory firm; revenue lost from client reductions in use of Schwab services; costs associated with replacing employees, including recruiting, hiring and training replacement employees, and lost productivity. Therefore, I agree to pay Schwab the following liquidated damages: (a) four percent (4%) of any client assets transferred from Schwab or diverted from Schwab's retail business to an investment advisory firm, including but not limited to one using Schwab as custodian of its clients' accounts, for any client who was solicited and/or where Confidential Information was used or disclosed; and/or, (b) seventy-five percent (75%) of the most recent full year's total annual compensation paid by Schwab to each employee solicited or induced to leave his or her employment. I agree that these formulas represent reasonable estimates of the compensatory damages that Schwab will incur as a result of violations of Paragraph 3 and/or Paragraph 1 relating to clients and/or their accounts, and are not a penalty. These liquidated damages are in addition to any other non-compensatory relief that Schwab may be entitled to, including but not limited to injunctive relief and/or punitive damages.

12. **General Provisions.** I agree that if Schwab or I bring an action to enforce any provision of this Agreement, the prevailing party shall be entitled to attorneys' fees and costs to enforce such claim. If any provision of this Agreement is found to be invalid or unenforceable, I agree that such provision should be deemed modified to the

extent necessary to make it enforceable. If a court or arbitration panel declines to amend the provision to make it enforceable, then the remaining provisions of this Agreement shall remain in full force and effect. The terms of this Agreement and any disputes arising out of it shall be governed by, and construed in accordance with, the laws of the state in which I was last employed by Schwab, without giving effect to such state's conflict of law principles. I agree that this Agreement supplements any prior agreements I have with Schwab, all of which remain in full force and effect.

---

**EXHIBIT A**
List of family members and other relatives (identified by familial status) and individuals or entities to whom I provided financial services prior to joining Schwab:

X click here to electronically inital Exhibit A

---

**EXHIBIT B**
California Labor Code Section 2870

   a. Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

      1. Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

      2. Result from any work performed by the employee for the employer.

   b. To the extent that a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

X click here to electronically inital Exhibit B

---

**EXHIBIT C**
Pre-Existing Intellectual Property Registrations:

X click here to electronically inital Exhibit C

**Signature**
I represent that I am the individual indicated in the "Work Contact Information" section in the upper left hand corner of this screen, that I accessed this screen by logging in to the Schwab network and using my unique password, and that I have not shared my password with anyone.

By clicking "I Agree" below I am creating a binding contract with Schwab, just as enforceable as if it were a handwritten signature.

I Agree

**EXHIBIT "G"**

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

AMERICAN AIRLINES FEDERAL
CREDIT UNION,

GENERAL JURISDICTION DIVISION

                    Plaintiff,

Case No.: 2015-017241-CA-01

v.

CARLOS HERNAN FONSECA, and
MORGAN STANLEY SMITH BARNEY LLC,

                    Defendants.

**MORGAN STANLEY SMITH BARNEY LLC AND CARLOS HERNAN FONSECA'S
MEMORANDUM IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Pursuant to Florida Rule of Civil Procedure 1.510, Defendants Morgan Stanley Smith

Barney LLC ("Morgan Stanley") and Carlos Hernan Fonseca ("Fonseca") respectfully request

that this Court grant summary judgment.  Defendants are entitled to judgment as a matter of law

on American Airlines Federal Credit Union's ("AAFCU") claims for breach of the Non-Use and

Non-Disclosure of Confidential Information Covenant ("Non-Disclosure Covenant"), breach of

the Non-Solicitation/Non-Acceptance/Non-Interference Covenant, misappropriation of trade

secrets, unjust enrichment and tortious interference with business relations.

AAFCU bases its Non-Disclosure Covenant and misappropriation claims on Mr.

Fonseca's provision of gross production and gross asset information to Morgan Stanley during

his discussions with Morgan Stanley about potential employment. This information, however,

contained no customer information. Instead, it documented Mr. Fonseca's personal earnings,

monthly gross commissions, amount of assets under his care, and types of investment holdings

1



held by his customers on a macro level. This information is not confidential and on its face is not a trade secret as it has no independent economic value.

It is undisputed that Mr. Fonseca took no other information. Mr. Fonseca and Morgan Stanley anticipate that AAFCU will argue Mr. Fonseca's possession of customer names and contact information is a trade secret and constitutes confidential information used in violation of the Non-Disclosure Covenant, but the undisputed facts show that Mr. Fonseca used his memory and looked up contact information via Spokeo, a public internet directory of contact information. These remembered names and publicly available addresses and telephone numbers are not trade secret information. To the extent AAFCU claims Mr. Fonseca's memory of his customers' names is confidential information and that he is barred from using or disclosing such information, that interpretation creates a de facto restrictive covenant in perpetuity unenforceable as a matter of Texas law, which applies to AAFCU's contract claims.

AAFCU's claim for breach of the Non-Solicitation/Non-Acceptance/Non-Interference Covenants fails as these provisions are overly broad and unenforceable as a matter of law. AAFCU may not restrict Mr. Fonseca from soliciting clients—or even *accepting* clients—for brokerage and investment advisory services when AAFCU admittedly does not and, by law, may not provide such services to the public. AAFCU has no legitimate business interest to restrict such activity. **AAFCU, in fact, admits that it does not offer brokerage services to the public.** AAFCU's true purpose is to inappropriately restrict Mr. Fonseca—who was a registered securities professional at Cetera Investment Services, LLC a third-party broker-dealer—from offering broker-dealer services to AAFCU members or even accepting such requests for services, because AAFCU ███████████████████████ with Cetera based ████████████ ██████████ a dual employee like Mr. Fonseca ████████████████. Under Texas

law, AAFCU has no legitimate business interest in preventing this type of competition from Mr. Fonseca simply because of its contractual relationship with Cetera.

Finally, in order to avoid an arbitration provision, AAFCU stated, time and again, that the broker-dealer services Mr. Fonseca provided are not at issue in this case. Indeed, the District Court of Appeal found that AAFCU's claims flowed *only* from the 2008 Employment Agreement, not the broker-dealer dual employment agreement which addressed brokerage services. Pursuant to judicial estoppel, AAFCU cannot now argue otherwise. Thus, AAFCU is stuck arguing that an overly broad restrictive covenant is necessary to protect its credit union business even though the provision restricts Mr. Fonseca from providing services that AAFCU explicitly does not and may not offer. For these reasons, Morgan Stanley is entitled to summary judgment on all claims and AAFCU's Amended Complaint should be dismissed.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Two agreements governed Carlos Fonseca's employment at AAFCU.

Carlos Fonseca entered into an Employment Agreement with AAFCU (the "2008 Employment Agreement") on or around June 4, 2008. (*See* Statement of Undisputed Material Facts ("SUMF") No.1; Am. Compl., Ex. A). Two years later, Mr. Fonseca executed a "'Dual Employment' and Noncompetition Agreement for Service Center Investment Executive" ("2010 Dual Employment Agreement") on or around September 13, 2010. (*See* SUMF No. 2; Deposition of Carlos Fonseca ("Fonseca Dep."), Ex. 5 (SLK-FONSECA-000020-22)). This second agreement was executed by Mr. Fonseca, AAFCU, and the broker-dealer PrimeVest Financial Services, Inc. ("PrimeVest"). (SUMF No. 3; *id.*). PrimeVest ███████████████ ████████████████████████ to Cetera Investment Services, LLC (hereinafter, "Cetera").

3

(SUMF No. 4; Deposition of Thomas Mitchell ("Mitchell Dep.") 147:23-148:12, Ex. 43 (A-000242)).

The Non-Disclosure Covenant that AAFCU seeks to enforce is contained in the 2008 Employment Agreement. That agreement defines confidential information as:

> non-public information and materials concerning AAFCU and/or its Clients, whether or not such information and materials are patentable or protectable by copyright, whether such information or materials are memorized, in hard copy, electronic or other form, including but not limited to information or materials concerning any of the following: Client information (including but not limited to lists of members and Clients, members' and Clients' names, contact information, finances, assets, liabilities, histories, preferences, and strategies, as well as any compilations of same).... *The term Confidential Information does not, however, include information that (a) has become known to the public generally through no fault of Employee....*

(SUMF No. 5; Am. Compl., Ex. A, ¶ 2) (emphasis added).

The Non-Solicitation provision that AAFCU seeks to enforce is also contained *only* in the 2008 Employment Agreement and purports to restrain Ms. Fonseca from:

> (a) solicit[ing] or accept[ing] Investment and Insurance Services business from any Client, or (b) solicit[ing], encourag[ing], induc[ing] or attempt[ing] to induce any Client to cancel, limit or postpone the Client's Investment and Insurance Services business with AAFCU, to transfer any of the Client's accounts away from AAFCU and/or to utilize Employee, directly or indirectly, for such Investment and Insurance Services.

(SUMF No. 6; Am. Compl., Ex. A, ¶ 3, Covenant Five).

"Investment and Insurance Services" are defined as follows in the 2008 Employment Agreement:

> Investment and Insurance Services. For the purposes of this Agreement, "Investment and Insurance Services" means providing brokerage, investment and/or insurance advice and/or selling brokerage, investment, insurance and/or other financial products to Clients (as defined in Paragraph 2 below) during Employee's Service.

4

(SUMF No. 7; *id.*, ¶ 1). The 2008 Employment Agreement is governed by Texas law. (SUMF No. 8; *id.*, ¶ 5, p. 7).

**B.      Information Mr. Fonseca provided Morgan Stanley is not confidential.**

No dispute exists as to what information Mr. Fonseca provided Morgan Stanley. He provided a summary document showing Mr. Fonseca's "trailing 12" gross revenue month-by-month which did not contain customer specific information. (SUMF No. 9; Fonseca Dep., 75:10-18; 77:14-78:5, Ex. 4 (SLK-FONSECA-000015-16)). He provided another gross "production report" from 2011 to 2015—which also contained only macro information related to Mr. Fonseca's production—found at Exhibit 8 to Mr. Fonseca's deposition. (SUMF No. 10; *id.*, 78:13-79:12, Ex. 8 (MSSB:AAFCU (Fonseca) 000613); Deposition of William Van Scoyoc ("Van Scoyoc Dep."), 78:19-79:24). And he provided an asset allocation of Mr. Fonseca's "book of business," *i.e.* what investments were held and the gross amount placed in each investment, found at Exhibit 9 to Mr. Fonseca's deposition. (SUMF No. 11; Fonseca Dep., 82:5-20, Ex. 9 (MSSB:AAFCU (Fonseca) 000313-26). Again, none of these documents contain client-specific information. (SUMF No. 12; *Id*; Fonseca Dep., 75:10-18; 77:14-78:5; 78:13-79:12, Ex. 8 (MSSB:AAFCU (Fonseca) 000613); Van Scoyoc Dep., 73:7-14; 78:19-79:24). As Mr. Van Scoyoc, Morgan Stanley's complex manager, explained in connection with the "asset allocation" document:

> Q. Okay. I mean, looking at the document, does it seem to provide the type of information that you would want to see in evaluating his assets under management at his previous employer?
> A. Yes. We would never want client information, 'cause we don't take that. So this is just a general breakdown of the assets themselves with what appears to be a total asset under management number there.

(Van Scoyoc Dep., 73:7-14).

In addition, no dispute exists that Mr. Fonseca did not take a customer list with him from AAFCU. Instead, he compiled his own customer information using his memory and the Internet, including Google searches and Spokeo. (SUMF No. 13; Fonseca Dep., 139:25-40:5; 140:21-141:9; 142:17-144:1; 147:13-148:24; 153:23-155:24; 161:8-19; 166:20-167:12).

**C.    AAFCU does not provide broker-dealer services.**

AAFCU is a credit union; it is not a broker-dealer or an insurance company and, thus, by law, is not permitted to offer brokerage services. (*See* SUMF No. 14; Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 65:11-66:12; Mitchell Dep., Exs. 30 (A – 000160), 43 (A – 000242)). It is undisputed that AAFCU dually employs individuals, such as Mr. Fonseca, who provide broker-dealer services for registered broker-dealers like Cetera. (SUMF No. 15; *see* Deposition of Carlos Fonseca ("Fonseca Dep."), Ex. 5 (SLK-FONSECA-000020-22). Pursuant to this arrangement, AAFCU entered into a contract with Cetera titled Full Service Securities Agreement (the "Securities Agreement"), detailing the relationship between AAFCU and Cetera. (SUMF No. 16; *see* Mitchell Dep., Ex. 42 (A – 00329-61)). The Securities Agreement provides that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████. (SUMF No. 17; *id.*, Ex.42 p. 1).[1]

**D.    Mr. Fonseca does not provide credit union services for Morgan Stanley.**

---

[1] In addition, Cetera and AAFCU explicitly agreed that ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████. (SUMF No. 18; *id.*, Ex.42 pp. 1-2). AAFCU ████████████████████████████████. (SUMF No. 19; *id.*).

Mr. Fonseca resigned from AAFCU and Cetera on May 8, 2015 to join Morgan Stanley. (SUMF No. 20; *see* Am. Compl., ¶ 10). Mr. Fonseca provides broker-dealer services at Morgan Stanley. (SUMF No. 21; Affidavit of Carlos Fonseca ("Fonseca Aff."), ¶ 6). The customers who opened accounts at Morgan Stanley did not move brokerage accounts from AAFCU to Morgan Stanley; they moved from *Cetera* to Morgan Stanley. (SUMF No. 22; Mitchell Dep., 47:9-13, Ex. 30 (A – 000160); Fonseca Dep., 96:9-97:7; 116:3-8). Indeed, AAFCU communicates to its customers that securities and insurance products are offered through Cetera and that advisory services may only be offered by an Investment Advisor Representative, like Mr. Fonseca. (SUMF No. 23; Notice of Filing Hearing Transcript, dated Feb. 4, 2016, 63:25-66:12; Ex. 30 (A – 000160)). Although part of his employment at AAFCU was to recommend banking services at AAFCU, Mr. Fonseca did not provide any such services. (SUMF No. 24; *see* Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 74:22-75:23). Mr. Fonseca does not provide banking or other credit union services to clients on behalf of Morgan Stanley either. (SUMF No. 25; Fonseca Aff., ¶ 5).

**E.     AAFCU adopts the position throughout this litigation that the brokerage services previously provided by Mr. Fonseca through Cetera are "not at issue in this case."**

AAFCU's attorney laid out its position succinctly earlier in this case:

> The 2008 agreement is an umbrella agreement that applies to a range of activities beyond just the sale of registered securities. The 2010 agreement addresses a specific facet of the transaction which is Mr. Fonseca's ability to sell registered securities. Okay?
>
> The evidence will be from Mr. Mitchell that AAFCU would seek to enforce in court the noncompetition provisions of the 2008 agreement regardless of whether Mr. Fonseca was selling registered securities at his new organization.
>
> If he went over to Morgan Stanley and was just doing financial plans or if he went over to Morgan Stanley and was just dealing with mortgages or if he went over to Morgan Stanley and was just selling nonregistered products such as fixed annuities and fixed insurance, AAFCU would still seek to enforce in court that May 2008 agreement. And that's because of the access to that closed membership that Mr. Fonseca was provided.

AAFCU cannot replace that. It's not a situation where it can go out and find new customers just off the street. Its only people that can be members are people who are in the airline industry. That's its business model.

And to allow Mr. Fonseca to quote, unquote, steal those customers by soliciting them in violation of the noncompete agreement, by accepting their business in violation of the noncompete agreement, by using confidential information to solicit them in violation of the noncompete agreement, fundamentally upsets that business model.

(SUMF No. 26; Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 43:11-44:21).

AAFCU maintains that Mr. Fonseca's work as a registered representative is simply "not at issue in this case." (SUMF No. 27; AAFCU's Memo. Opp. Mot. Dismiss, filed Nov. 3, 2015, p. 7). AAFCU stated that it is not suing pursuant to the 2010 Dual Employment Agreement and that the 2008 Employment Agreement and the 2010 Dual Employment Agreement "are separate and independent contracts each of which fulfill separate and distinct functions," while provisions in one agreement cannot be "imported" into the other. (SUMF No. 28; *id.*, pp. 6, 20). According to AAFCU, the 2010 Dual Employment Agreement "does not alter the basic terms of [the 2008 Employment Agreement] in any way," rather it is "merely a vehicle to facilitate Mr. Fonseca's ability to offer the full-range of services contemplated by his duties as a Financial Advisor." (SUMF No. 29; *id.*, pp. 6-7).

### III.    ARGUMENT

**A.    Standard of review.**

"Summary judgment should be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment upon application of the law to the undisputed material facts." *Acosta, Inc. v. Nat'l Union Fire Ins. Co.*, 39 So. 3d 565, 573 (Fla. Dist. Ct. App. 1st Dist. 2010). Under Texas law, whether a restrictive covenant is a reasonable restraint of trade is a question of law for the court. *John R. Ray & Sons v. Stroman*, 923 S.W.2d 80, 85 (Tex. App. Houston 14th Dist. 1996). Restraints on trade "deserve rigorous legal scrutiny" and "should be

used sparingly and drafted narrowly." *Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 788 (Tex. 2011) (Willet, J., concurring). "Naked restraints of trade" are not enforceable. *Id.* at 775-76.

**B.     AAFCU's Non-Use and Non-Disclosure Covenant is unenforceable.**

Texas courts hold that information "accessible by industry inquiry" or "from a phone book or comparable avenue of public access" is, as a matter of law, not confidential. *M. N. Dannenbaum, Inc. v. Brummerhop*, 840 S.W.2d 624, 632-33 (Tex. App. 1992); *Miller Paper Co. v. Roberts Paper Co.*, NO. 07-95-0030-CV, 1995 Tex. App. LEXIS 1475, at **3-5 (App. June 30, 1995). Texas courts hold that the use of this information in rare occasions can be restricted—but only if the employee gains the information through a breach of confidence (and not through public inquiry). *See Anderson Chem. Co. v. Green*, 66 S.W.3d 434, 442-43 (Tex. App. 2001).

Here, no dispute exists that the customer information Mr. Fonseca utilized was compiled through his memory and public information on the Internet. (SUMF No. 13; Fonseca Dep., 139:25-40:5; 140:21-141:9; 142:17-144:1; 147:13-148:24; 153:23-155:24; 161:8-19; 166:20-167:12). He did not breach any confidence in compiling this information. Further, the contract provision states that the "[t]he term Confidential Information does not, however, include information that (a) has become known to the public generally through no fault of Employee...." (SUMF No. 5; Am. Compl., Ex. A, ¶ 2). Ultimately, the facts show that Mr. Fonseca's customer phone numbers and addresses are easily accessible from publicly available sources, and none of this information constitutes "confidential information" as a matter of law. If the Court were to hold otherwise and declare that Mr. Fonseca cannot use his memory of his customers' identities and look up contact information, this provision would transform into a *de facto* restrictive

9

covenant provision into perpetuity with no time limitation, which is unenforceable. Tex. Bus. & Com. Code § 15.50.

Should Plaintiff argue that Mr. Fonseca's provision of certain gross production data to Morgan Stanley somehow violated this provision, Plaintiff's position would be that Mr. Fonseca can never provide any such information to a potential new employer and that he is contractually obligated to remain an AAFCU employee for life. Such a provision would, of course, be unenforceable. Moreover, the information AAFCU seeks to protect is not AAFCU information at all, rather it is brokerage information belonging to Cetera, the broker dealer utilized to service Mr. Fonseca's customers. Finally, AAFCU fails to, and cannot establish how, it has been damaged by Mr. Fonseca's transmission of information belonging to Cetera.

## C.   Morgan Stanley and Mr. Fonseca did not misappropriate trade secret information.

Mr. Fonseca and Morgan Stanley do not and never had any AAFCU trade secret information in their possession. Mr. Fonseca did not misappropriate trade secrets from AAFCU and could not have used any such information after he was employed by Morgan Stanley. AAFCU's misappropriation claim rests on Mr. Fonseca's compilation of customer names, addresses and/or phone numbers using only his memory and the public record. (SUMF No. 13; Fonseca Dep., 139:25-40:5; 140:21-141:9; 142:17-144:1; 147:13-148:24; 153:23-155:24; 161:8-19; 166:20-167:12). Mr. Fonseca did not take any documents reflecting such information from AAFCU. (*Id.*). The names, addresses and telephone numbers of customers serviced by Mr. Fonseca are public information and not protectable trade secret information.

Florida law and not private contracts determines what qualifies as a "trade secret." To be a protectable "trade secret," the information must "not be readily ascertainable by proper means." Fla. Stat. Ann. § 688.002 (4). Customer lists are not trade secrets or confidential

information unless they contain information not generally known or readily available from public sources. *Barbiero-Powell v. Bernstein Leibstone Associates, Inc.*, 624 So.2d 383 (Fla. 4th DCA 1993) (reversing injunction against former employee due to lack of evidence a list was compiled at great expense or that the information was not otherwise available to the business community). Absent evidence that a customer list was the product of great expense or effort, that it was a distillation of a larger list, or that it included information not available from public sources, a customer list cannot be protected. *Templeton v. Creative Loafing Tampa, Inc.*, 552 So.2d 288 (Fla. 2d DCA 1989).

Therefore, Mr. Fonseca's compilation of customer names from memory and public information found on the Internet is not a trade secret. Mr. Fonseca did not take a list of any kind from AAFCU, but rather the customer information was compiled by his own efforts and from publically available sources. Mr. Fonseca knew the identities of the clients he serviced. "A former employee cannot be precluded from utilizing . . . customer lists she herself develops." *Mittenzwei v. Indus. Waste Serv., Inc.*, 618 So. 2d 328, 329-30 (Fla. 3d DCA 1993). Moreover, employees are free to reconstruct customer lists using their own memory and publicly available sources. *See Harry G. Blackstone, D.O. v. Dade City Osteopathic Clinic*, 511 So. 2d 1050, 1051-52 (Fla. 2d DCA 1987) (former employee did nothing wrong when he "compiled his list of addresses from patients themselves, from the phone book, and from his own memory").

AAFCU may argue that gross production and gross asset information that Mr. Fonseca provided Morgan Stanley constitutes a trade secret. Any such argument is untenable. This information cannot be a trade secret — it does not have independent economic value from being unknown. Fla. Stat. Ann. § 688.002 (4)(a). This information comprised Mr. Fonseca's personal income earnings, monthly gross commissions, amounts of assets under his care, and general

types of investment holdings on a macro level. This information only had value for Mr. Fonseca, as it related directly to him, not AAFCU as a whole. Moreover, the gross production and asset information at issue did not belong to AAFCU, but Cetera. Cetera, by virtue of its noninvolvement in this case, does not believe this information to have independent economic value.

**D.      The non-solicitation provision is unenforceable under Texas law.**

Texas's "Covenants Not to Compete Act" provides, in part, as follows:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code § 15.50.[2] Likewise, such a provision must not "take unfair advantage of the disparity of bargaining power between [employer and employee] or too severely impair the employee's personal freedom and economic mobility." *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 854 n.10, 52 Tex. Sup. Ct. J. 616 (2009).

According to Texas courts, "[a] covenant is unreasonable if it is greater than required for the protection of the person for whose benefit the restraint is imposed or imposes undue hardship upon the person restricted." *Republic Servs., Inc. v. Rodriguez*, No. 14-12-01054-CV, 2014 WL 2936172, at *7 (Tex. App. June 26, 2014) (quoting *Zep. Mfg. Co. v. Harthcok*, 824 S.W.2d 654, 660 (Tex.App.-Dallas 1992, no writ)). Indeed, Texas courts hold that a plaintiff who cannot prove an unfair competitive disadvantage cannot enforce a restrictive covenant. The provision is unenforceable as no protectable business interest is at stake. *Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 772 (Tex. 2011). Indeed, AAFCU is required to show "how" the restriction

---

[2] Texas courts have recognized that this statute applies equally to non-solicitation provisions as it does non-competition provisions. *Ally Fin., Inc. v. Gutierrez*, No. 02-13-00108-CV, 2014 Tex. App. LEXIS 792, at *16 n.5 (App. Jan. 23, 2014).

protects the alleged business interest. *Wharton Physician Servs., P.A. v. Signature Gulf Coast Hosp., L.P.*, No. 13-14-00437-CV, 2016 Tex. App. LEXIS 348, at **11-12 (App. Jan. 14, 2016).

A restrictive covenant is overbroad and unenforceable when it restricts activity not related to the business of the employer. *See Diversified Human Res. Grp., Inc. v. Levinson-Polakoff*, 752 S.W.2d 8, 10-12 (Tex. App. 1988) (refusing to enforce a covenant not to compete restricting employee from engaging in *any* kind of personnel recruitment, including recruitment of insurance agents, as employer's business involved recruitment of data processing personnel). Texas courts hold that a restrictive covenant "must not restrain" an employee's activities in an area of business or in connection with professional services that "his former work has not...given him the opportunity" to pursue. *Weatherford Oil Tool Co. v. Campbell*, 340 S.W.2d 950, 952 (Tex. 1960); *see also Nw. Fed. Credit Union v. SBC Fin., LLC*, No. 1:16cv1299(JCC/JFA), 2016 U.S. Dist. LEXIS 149329, at **10-14 (E.D. Va. Oct. 27, 2016) (holding that "[p]laintiff fails to offer any...evidence of a legitimate business interest that would be served by prohibiting [defendants] from being employed in any capacity by a competing financial institution" and, as such, the restriction was overbroad and unenforceable, as it prohibited working in any role— even one that did not "directly use [defendants'] expertise"). In this case, AAFCU attempts to restrain the work that Mr. Fonseca performed as a registered representative for Cetera.

1. <u>Mr. Fonseca's work for Morgan Stanley does not compete with AAFCU, and, thus, AAFCU cannot establish that enforcing the restrictive covenant is required to prevent unfair competitive disadvantage.</u>

Mr. Fonseca's work on behalf of Morgan Stanley does not compete with AAFCU—as the two entities do not offer competing services.[3] AAFCU is a credit union; it is not a broker-dealer or an insurance company. (SUMF No. 14, 23; Notice of Filing Hearing Transcript, dated Feb. 4,

---

[3] *See* BLACK'S LAW DICTIONARY 322 (9th ed. 2009) (defining "competition" as "...the effort or action of two or more commercial interests to obtain the same business from third parties").

2016, at 65:11-66:12; Mitchell Dep., Exs. 30, 43). AAFCU by law is not permitted to offer brokerage services. (*Id.*). Cetera provides those services. (SUMF 17-18; Mitchell Dep. Ex. 42 at pp. 1-2.) It is undisputed that Mr. Fonseca did not provide brokerage services for AAFCU; Mr. Fonseca did so for Cetera. (*Id.*; SUMF 15, Fonseca Dep. Ex. 5.) Customers have not moved their accounts from AAFCU to Morgan Stanley; in fact, AAFCU's own corporate representative testified that *the accounts are moving from Cetera to Morgan Stanley*. (SUMF 22; Mitchell Dep., 47:9-13; *see also* Fonseca Dep., 96:9-97:7; 116:3-8). As such, Cetera competes with Morgan Stanley in this situation—not AAFCU.

AAFCU seeks to restrain Mr. Fonseca from "solicit[ing] or accept[ing] Investment and Insurance Services business," including, "investment and/or insurance advice and/or selling brokerage, investment, insurance and/or other financial products" even though AAFCU does not offer such services.[4] (SUMF No. 6; Am. Compl., Ex. A, ¶ 3). No competitive disadvantage to AAFCU could result if the Court does not enforce the restrictive covenant at issue; thus the covenant is unenforceable. *See Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 772 (Tex. 2011).

Texas courts will not enforce a restrictive covenant not sufficiently related to the business of the employer. *See Diversified Human Res. Grp., Inc.*, 752 S.W.2d at 10-12. As noted, the restrictive covenant covers services that AAFCU does not and cannot offer. As such, the covenant is unenforceable. Case law outside of Texas yields few examples where a bank files a lawsuit against a broker-dealer over non-solicitation provisions. Of the two cases found, the

---

[4] Section (a) of the restrictive covenant is the only portion relevant to this case. Section (b) addresses factual circumstances which do not exist as it purports to limit activities related to "Investment and Insurance Services business *with AAFCU*" and restrictions related to moving accounts *from AAFCU*. (*See* Am. Compl., Ex. A, ¶ 3) (emphasis added). As noted, AAFCU does not offer brokerage services, so no such business is "with AAFCU," while any brokerage accounts at issue would be at Cetera—not AAFCU. (*See* Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 65:11-66:12; Mitchell Dep., 47:9-13; Fonseca Dep., 96:9-97:7; 116:3-8).

bank's broker-dealer was a plaintiff as well. In these cases, the courts melded the interests of both the plaintiff bank and plaintiff broker-dealer to find a legitimate interest justifying the restriction. *See Webster Bank, N.A. v. Cahill*, No. CV094018982S, 2009 Conn. Super. LEXIS 1672, at *4 (Super. Ct. June 16, 2009); *Fifth Third Bank v. Welch*, No. 09CVH-05-7343, 2009 Ohio Misc. LEXIS 544, at *24-25 (Ohio Ct. Com. Pl. June 12, 2009). In the instant case, Cetera is not a plaintiff and never alleged that Mr. Fonseca is subject to any restrictive covenant.

      2.     <u>The restrictive covenant is far greater than necessary to protect AAFCU's alleged "business interest."</u>

Even assuming *arguendo* that AAFCU could establish that its alleged "business interest" is protected by the relevant restrictive covenant, the covenant, as written, is too broad to enforce. AAFCU admits that the business interest at issue is "access to the closed membership" of AAFCU. (Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 43:11-44:21). In short, AAFCU's position is that, even though it does not offer the services that Mr. Fonseca offers at Morgan Stanley, Mr. Fonseca should not be able to solicit its members for any purpose. AAFCU thus attempts to restrict financial services options offered to its members so that AAFCU can manipulate its compensation by forcing members to use AAFCU's pre-approved vendors—a blatant restraint on trade: "Where a naked restraint of trade masquerades as a covenant not to compete, we must strike it down—always." *Marsh United States, Inc. v. Cook*, 354 S.W.3d 764, 788 (Tex. 2011) (Willet, J., concurring).

Blue-penciling a restrictive covenant is allowed under Texas law, and Texas courts will restrict based on the particular product at issue. *See Transperfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 756-57 (S.D. Tex. 2009). As such, if AAFCU's argument was not simply a backdoor effort to restrict broker-dealer services (after repeatedly stating that broker-dealer services are not at issue in this case)— it should agree that Mr. Fonseca should only be restricted

from (a) entering into a dual-employment agreement with a credit union and a broker-dealer and (b) referring AAFCU clients to a credit union or bank that offers competing products to those offered by AAFCU. Any other restriction—goes far beyond the "scope of activity" necessary to protect AAFCU's interest in its closed membership base to which **it *only* offers credit union services.**

> 3.    <u>AAFCU is judicially estopped from claiming Mr. Fonseca's provision of services as a registered representative to AAFCU customers at Morgan Stanley violates Mr. Fonseca's employment agreement.</u>

The general rule under Florida law is that a party cannot assert inconsistent positions in judicial proceedings:

> It is a general rule that parties will be held to the theories upon which they secure action by the court, and in pursuance of the rule that a party may not take inconsistent positions in a litigation, he is bound by his election of the theory upon which he seeks recovery. So, one who assumes a particular attitude in a case and adopts a particular theory is generally estopped to assume in a pleading filed in a later phase of that same case, or another case, any other or inconsistent position toward the same parties and subject matter.

*Federated Mut. Implement & Hardware Ins. Co. v. Griffin*, 237 So. 2d 38, 41-42 (Fla. Dist. Ct. App. 1st Dist. 1970). The law provides that a party cannot "have his cake and eat it, too," *Fort v. Fort*, 167 So. 2d 315, 317-18 (Fla. Dist. Ct. App. 1st Dist. 1964), by taking inconsistent positions during the course of litigation.

In order to avoid arbitration, AAFCU argued in its opposition to the Motion to Compel Arbitration that Mr. Fonseca's "dual employment" with Cetera and his provision of brokerage services is not at issue. (*See* SUMF No. 26; Notice of Filing Hearing Transcript, dated Feb. 4, 2016, at 43:11-44:21). As such, brokerage services cannot be at issue with regard to the Court's interpretation of AAFCU's restrictive covenant and its determination of AAFCU's alleged legitimate business interest. It is inequitable to allow AAFCU to argue that brokerage services

were not at issue at the beginning of the case only to allow AAFCU to change its position and argue that brokerage services are now at issue with respect to its claim for damages and permanent injunctive relief. The record is clear that Mr. Fonseca did not provide brokerage services for AAFCU. Thus, AAFCU cannot be awarded relief or damages for Mr. Fonseca's provision of brokerage services at Morgan Stanley, a registered broker dealer that does not compete with the credit union's services.

**E.       The non-acceptance/non-interference provisions are unenforceable under Texas law.**

As noted, the restrictive covenant AAFCU seeks to enforce also purports to prohibit Mr. Fonseca from *accepting* business from customers that decide to move their business to Morgan Stanley. This non-acceptance provision is unenforceable on its face as AAFCU is unable to articulate how restraining the decision of customers to join Morgan Stanley for servicing their securities accounts is necessary to prevent unfair competitive advantage.

Courts uniformly will not enforce "non-*acceptance*" covenants for several reasons, including, (1) "[t]here is a strong public policy interest in allowing third parties, not bound by the restrictive covenant, to make unencumbered decisions regarding those individuals and entities with whom they would like to do business," *Corporate Technologies, Inc. v. Harnett*, 943 F. Supp. 2d 233, 245 (D. Mass.), *aff'd*, 731 F.3d 6 (1st Cir. 2013); and (2) because it is near impossible for an employer to display a protectable business interest in restricting the free will of third-parties. *See Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 570 (M.D. Pa. 2014); *see also Holland Ins. Grp., LLC v. Senior Life Ins. Co.*, 766 S.E.2d 187, 193 (Ga. Ct. App. 2014) ("Generally, a restrictive covenant may not validly preclude the employee from accepting unsolicited business from customers of his former employer."); *Curtis 1000, Inc. v. Martin*, 197 F. App'x 412, 419-21 (6th Cir. 2006) (applying Georgia law) (quoting *Waldeck v.*

17

*Curtis 1000, Inc.*, 583 S.E.2d 266 (Ga. Ct. App. 2003)) ("'[A] covenant prohibiting a former employee from merely accepting business, without any solicitation, is not reasonable.'").

Texas courts hold that restrictive covenants binding third parties are unenforceable. *Wharton Physician Servs., P.A. v. Signature Gulf Coast Hosp., L.P.*, No. 13-14-00437-CV, 2016 Tex. App. LEXIS 348, at *13 (App. Jan. 14, 2016). Further, Texas courts favorably cite the premise reflected in the case law above and, like the courts in these sister states, have not enforced non-acceptance provisions, as, among other things, such a restriction would "unreasonably impact[]...the public's ability to choose" a professional. *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387-88 (Tex. 1991).

Public policy demands that customers are given the freedom to choose with whom they deal. *See Unisource Worldwide, Inc. v. Schroeder*, No. 06-4007 RHKAJB, 2006 WL 3030887, at *7 (D. Minn. Oct. 23, 2006). "To enjoin the employee from providing services would unnecessarily infringe on the customer's exercise of choice in the person with whom the customer deals." *Raymond James & Assocs., Inc. v. Leonard & Co.*, 411 F. Supp. 2d 689, 695 (E.D. Mich. 2006) (*citing Hayes-Albion v. Kuberski*, 421 Mich. 170, 184, 364 N.W.2d 609, 615 (1984)); *see also Leon M. Reimer & Co., P.C. v. Cipolla*, 929 F. Supp. 154, 158-59 (S.D.N.Y. 1996) (noting a non-acceptance provision "unreasonably limits...clients' ability to choose professional services"). The restrictive covenant which AAFCU seeks to enforce violates this public policy.

The Financial Industry Regulatory Authority ("FINRA") governing broker-dealer services that AAFCU seeks to restrict recognizes the strong public policy regarding a customer's right to choose his or her advisor. In fact, FINRA prohibits the seeking of a judicial order barring or restricting the acceptance of a request to transfer a customer's account. FINRA Rule 2140.

Parties receiving a request for a customer account transfer are also obligated to "expedite and coordinate activities with respect to the transfer." FIRNA Rule 11870. AAFCU's restriction regarding non-acceptance thus violates public policy, as the restriction contravenes FINRA rules. Further, it is inconsistent for AAFCU to require Mr. Fonseca to abide by FINRA rules in its own 2008 Employment Agreement when AAFCU has no intention of doing so itself by seeking relief from this Court that interferes with the customer's right to choose their broker dealer. (*See* Am. Compl., Ex. A, ¶ 1).

**F.     Mr. Fonseca did not interfere with AAFCU's contractual and business relationships and he has not been unjustly enriched.**

Mr. Fonseca did not tortiously interfere with AAFCU's business expectancies. Under Florida law, to establish a claim for tortious interference with business relationships the plaintiff must prove: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damages to the plaintiff as a result of the breach of the relationship. *Toledo v. Hillsborough Cnty. Hosp. Auth.*, 841 So. 2d 482, 483 (Fla. 2d DCA 2003).

AAFCU cannot establish any intentional and unjustified interference. "[S]o long as improper means are not employed, activities taken to safeguard or promote one's own financial, and contractual interests are entirely non-actionable." *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1225 (Fla. 3d DCA 1980). Profit motive cannot be an improper means. *See id.* Instead, examples of improper means include those that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules, violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, duress, undue influence and methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition. *See*

19

Restatement (Second) of Torts § 767.  In the absence of improper means, a plaintiff must prove that the defendant's motive was "purely malicious" in order to succeed on a tortious interference claim.  *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004). As described above Mr. Fonseca did not take confidential information from AAFCU and the non-solicitation/non-acceptance/non-interference covenants are unenforceable. Without breach, there is no interference, no harm sustained, and no damage.  Mr. Fonseca's motive cannot be "purely malicious" as he took no credit union information and acted responsibly in furtherance of FINRA's own rules. Because AAFCU's claims for breach of contract, misappropriation of trade secrets and tortious interference fail as a matter of law, the Court should also find that AAFCU's remaining claim for unjust enrichment also fails.

## IV.    CONCLUSION

For these reasons, the Court should grant summary judgment in favor of Defendants.

Respectfully submitted,

/s/ *Salvador M. Hernandez*
Timothy L. Warnock (FL Bar No. 850489)
Salvador M. Hernandez (FL Bar *pro hac vice* No. 104063)
Riley Warnock and Jacobson, PLC
1906 West End Ave.
Nashville, TN 37203
(615) 320-3700
twarnock@rwjplc.com
shernandez@rwjplc.com

*Attorneys for Morgan Stanley Smith Barney LLC*

-and-

/s/ *Michael Taaffe*
Michael Taaffe
Scott A. La Porta
Shumaker, Loop Kendrick, LLP
240 South Pineapple Avenue, 10th Floor
Sarasota, FL  34230-6948

20

*Attorneys for Carlos Hernan Fonseca*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Answer was served by U.S. Mail and also via the Florida e-Filing Portal to the following:

Chad Heckman
Heckman Law Group
P.O. Box 12492
Tallahassee, Florida 32317

Martin P. Sipple
Ausley & McMullen, P.A.
123 South Calhoun Street
Tallahassee, FL 32301

on this November 13, 2017.

*/s/ Michael Taaffe*
Michael Taaffe
FL Bar # 490318
Scott A. La Porta
FL Bar# 0490490
Shumaker, Loop Kendrick, LLP
240 South Pineapple Avenue, 10th Floor
Sarasota, FL 34230-6948